519 U.S. 102 (1996)
M. L. B.
v.
S. L. J., individually and as next friend
OF THE MINOR CHILDREN, S. L. J. and M. L. J., et ux.
No. 95-853.
United States Supreme Court.
Argued October 7, 1996.
Decided December 16, 1996.
CERTIORARI TO THE SUPREME COURT OF MISSISSIPPI
*104 *104 *105 *106 Ginsburg, J., delivered the opinion of the Court, in which Stevens, O'Connor, Souter, and Breyer, JJ., joined. Kennedy, J., filed an opinion concurring in the judgment, post, p. 128. Rehnquist, C. J., filed a dissenting opinion, post, p. 129. Thomas, J., filed a dissenting opinion, in which Scalia, J., joined, and in which Rehnquist, C. J., joined, except as to Part II, post, p. 129.
Robert B. McDuff argued the cause for petitioner. With him on the briefs were Danny Lampley and Steven R. Shapiro. 
Rickey T. Moore, Special Assistant Attorney General of Mississippi, argued the cause for respondents. With him on the brief was Mike Moore, Attorney General.[*]
Justice Ginsburg, delivered the opinion of the Court.
By order of a Mississippi Chancery Court, petitioner M. L. B.'s parental rights to her two minor children were forever terminated. M. L. B. sought to appeal from the termination decree, but Mississippi required that she pay in advance record preparation fees estimated at $2,352.36. Because M. L. B. lacked funds to pay the fees, her appeal was dismissed.
Urging that the size of her pocketbook should not be dispositive when "an interest far more precious than any property right" is at stake, Santosky v. Kramer, 455 U. S. 745, *107 758-759 (1982), M. L. B. tenders this question, which we agreed to hear and decide: May a State, consistent with the Due Process and Equal Protection Clauses of the Fourteenth Amendment, condition appeals from trial court decrees terminating parental rights on the affected parent's ability to pay record preparation fees? We hold that, just as a State may not block an indigent petty offender's access to an appeal afforded others, see Mayer v. Chicago, 404 U. S. 189, 195-196 (1971), so Mississippi may not deny M. L. B., because of her poverty, appellate review of the sufficiency of the evidence on which the trial court found her unfit to remain a parent.

I
Petitioner M. L. B. and respondent S. L. J. are, respectively, the biological mother and father of two children, a boy born in April 1985, and a girl born in February 1987. In June 1992, after a marriage that endured nearly eight years, M. L. B. and S. L. J. were divorced. The children remained in their father's custody, as M. L. B. and S. L. J. had agreed at the time of the divorce.
S. L. J. married respondent J. P. J. in September 1992. In November of the following year, S. L. J. and J. P. J. filed suit in Chancery Court in Mississippi, seeking to terminate the parental rights of M. L. B. and to gain court approval for adoption of the children by their stepmother, J. P. J. The complaint alleged that M. L. B. had not maintained reasonable visitation and was in arrears on child support payments. M. L. B. counterclaimed, seeking primary custody of both children and contending that S. L. J. had not permitted her reasonable visitation, despite a provision in the divorce decree that he do so.
After taking evidence on August 18, November 2, and December 12, 1994, the Chancellor, in a decree filed December 14, 1994, terminated all parental rights of the natural mother, approved the adoption, and ordered that J. P. J., the adopting parent, be shown as the mother of the children on *108 their birth certificates. Twice reciting a segment of the governing Mississippi statute, Miss. Code Ann. § 93-15 103(3)(e) (1994), the Chancellor declared that there had been a "substantial erosion of the relationship between the natural mother, [M. L. B.], and the minor children," which had been caused "at least in part by [M. L. B.'s] serious neglect, abuse, prolonged and unreasonable absence or unreasonable failure to visit or communicate with her minor children." App. to Pet. for Cert. 9, 10.[1]
The Chancellor stated, without elaboration, that the natural father and his second wife had met their burden of proof by "clear and convincing evidence." Id., at 10. Nothing in the Chancellor's order describes the evidence, however, or otherwise reveals precisely why M. L. B. was decreed, forevermore, a stranger to her children.
In January 1995, M. L. B. filed a timely appeal and paid the $100 filing fee. The Clerk of the Chancery Court, several days later, estimated the costs for preparing and transmitting the record: $1,900 for the transcript (950 pages at $2 per page); $438 for other documents in the record (219 pages at $2 per page); $4.36 for binders; and $10 for mailing. Id., at 15.
Mississippi grants civil litigants a right to appeal, but conditions that right on prepayment of costs. Miss. Code Ann. §§ 11-51-3, 11-51-29 (Supp. 1996). Relevant portions of a transcript must be ordered, and its preparation costs advanced *109 by the appellant, if the appellant "intends to urge on appeal," as M. L. B. did, "that a finding or conclusion is unsupported by the evidence or is contrary to the evidence." Miss. Rule of App. Proc. 10(b)(2) (1995); see also Miss. Code Ann. § 11-51-29 (Supp. 1996).
Unable to pay $2,352.36, M. L. B. sought leave to appeal in forma pauperis. The Supreme Court of Mississippi denied her application in August 1995. Under its precedent, the court said, "[t]he right to proceed in forma pauperis in civil cases exists only at the trial level." App. to Pet. for Cert. 3.[2]
M. L. B. had urged in Chancery Court and in the Supreme Court of Mississippi, and now urges in this Court, that
"where the State's judicial processes are invoked to secure so severe an alteration of a litigant's fundamental rightsthe termination of the parental relationship with one's natural childbasic notions of fairness [and] of equal protection under the law, . . . guaranteed by [the Mississippi and Federal Constitutions], require that a person be afforded the right of appellate review though one is unable to pay the costs of such review in advance." Id., at 18.[3]

*110 II
Courts have confronted, in diverse settings, the "age-old problem" of "[p]roviding equal justice for poor and rich, weak and powerful alike." Griffin v. Illinois, 351 U. S. 12, 16 (1956). Concerning access to appeal in general, and transcripts needed to pursue appeals in particular, Griffin is the foundation case.
Griffin involved an Illinois rule that effectively conditioned thoroughgoing appeals from criminal convictions on the defendant's procurement of a transcript of trial proceedings. See id. , at 13-14, and nn. 2, 3 (noting, inter alia, that "mandatory record," which an indigent defendant could obtain free of charge, did not afford the defendant an opportunity to seek review of trial errors). Indigent defendants, other than those sentenced to death, were not excepted from the rule, so in most cases, defendants without means to pay for a transcript had no access to appellate review at all. Although the Federal Constitution guarantees no right to appellate review, id. , at 18, once a State affords that right, Griffin held, the State may not "bolt the door to equal justice," id. , at 24 (Frankfurter, J., concurring in judgment).
The plurality in Griffin recognized "the importance of appellate review to a correct adjudication of guilt or innocence." Id. , at 18. "[T]o deny adequate review to the poor," the plurality observed, "means that many of them may lose their life, liberty or property because of unjust convictions which appellate courts would set aside." Id. , at 19. Judging the Illinois rule inconsonant with the Fourteenth Amendment, the Griffin plurality drew support from the Due Process and Equal Protection Clauses. Id. , at 13, 18.
Justice Frankfurter, concurring in the judgment in Griffin, emphasized and explained the decision's equal protection underpinning:
"Of course a State need not equalize economic conditions. . . . But when a State deems it wise and just that *111 convictions be susceptible to review by an appellate court, it cannot by force of its exactions draw a line which precludes convicted indigent persons, forsooth erroneously convicted, from securing such a review . . . ." Id., at 23.
See also Ross v. Moffitt, 417 U. S. 600, 607 (1974) (Griffin and succeeding decisions "stand for the proposition that a State cannot arbitrarily cut off appeal rights for indigents while leaving open avenues of appeal for more affluent persons."). Summarizing the Griffin line of decisions regarding an indigent defendant's access to appellate review of a conviction,[4] we said in Rinaldi v. Yeager, 384 U. S. 305, 310 (1966): "This Court has never held that the States are required to establish avenues of appellate review, but it is now fundamental that, once established, these avenues must be kept free of unreasoned distinctions that can only impede open and equal access to the courts."
Of prime relevance to the question presented by M. L. B.'s petition, Griffin `s principle has not been confined to cases in which imprisonment is at stake. The key case is Mayer v. Chicago, 404 U. S. 189 (1971). Mayer involved an indigent defendant convicted on nonfelony charges of violating two city ordinances. Fined $250 for each offense, the defendant petitioned for a transcript to support his appeal. He alleged prosecutorial misconduct and insufficient evidence to convict. The State provided free transcripts for indigent appellants *112 in felony cases only. We declined to limit Griffin to cases in which the defendant faced incarceration. "The invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay," the Court said in Mayer, "is not erased by any differences in the sentences that may be imposed." 404 U. S., at 197. Petty offenses could entail serious collateral consequences, the Mayer Court noted. Ibid. The Griffin principle, Mayer underscored, "is a flat prohibition," 404 U. S., at 196, against "making access to appellate processes from even [the State's] most inferior courts depend upon the [convicted] defendant's ability to pay," id. , at 197. An impecunious party, the Court ruled, whether found guilty of a felony or conduct only "quasi criminal in nature," id. , at 196, "cannot be denied a record of sufficient completeness to permit proper [appellate] consideration of his claims," id. , at 198 (internal quotation marks omitted).[5]
In contrast to the "flat prohibition" of "bolted doors" that the Griffin line of cases securely established, the right to *113 counsel at state expense, as delineated in our decisions, is less encompassing. A State must provide trial counsel for an indigent defendant charged with a felony, Gideon v. Wainwright, 372 U. S. 335, 339 (1963), but that right does not extend to nonfelony trials if no term of imprisonment is actually imposed, Scott v. Illinois, 440 U. S. 367, 373-374 (1979). A State's obligation to provide appellate counsel to poor defendants faced with incarceration applies to appeals of right. Douglas v. California, 372 U. S. 353, 357 (1963). In Ross v. Moffitt, however, we held that neither the Due Process Clause nor the Equal Protection Clause requires a State to provide counsel at state expense to an indigent prisoner pursuing a discretionary appeal in the state system or petitioning for review in this Court. 417 U. S., at 610, 612, 616-618.

III
We have also recognized a narrow category of civil cases in which the State must provide access to its judicial processes without regard to a party's ability to pay court fees. In Boddie v. Connecticut, 401 U. S. 371 (1971), we held that the State could not deny a divorce to a married couple based on their inability to pay approximately $60 in court costs. Crucial to our decision in Boddie was the fundamental interest at stake. "[G]iven the basic position of the marriage relationship in this society's hierarchy of values and the concomitant state monopolization of the means for legally dissolving this relationship," we said, due process "prohibit[s] a State from denying, solely because of inability to pay, access to its courts to individuals who seek judicial dissolution of their marriages." Id., at 374; see also Little v. Streater, 452 U. S. 1, 13-17 (1981) (State must pay for blood grouping tests sought by an indigent defendant to enable him to contest a paternity suit).
Soon after Boddie, in Lindsey v. Normet, 405 U. S. 56 (1972), the Court confronted a double-bond requirement imposed by Oregon law only on tenants seeking to appeal adverse *114 decisions in eviction actions. We referred first to precedent recognizing that, "if a full and fair trial on the merits is provided, the Due Process Clause of the Fourteenth Amendment does not require a State to provide appellate review." Id., at 77. We next stated, however, that "[w]hen an appeal is afforded, . . . it cannot be granted to some litigants and capriciously or arbitrarily denied to others without violating the Equal Protection Clause." Ibid. Oregon's double-bond requirement failed equal protection measurement, we concluded, because it raised a substantial barrier to appeal for a particular class of litigantstenants facing evictiona barrier "faced by no other civil litigant in Oregon." Id. , at 79. The Court pointed out in Lindsey that the classification there at issue disadvantaged nonindigent as well as indigent appellants, ibid.; the Lindsey decision, therefore, does not guide our inquiry here.
The following year, in United States v. Kras, 409 U. S. 434 (1973), the Court clarified that a constitutional requirement to waive court fees in civil cases is the exception, not the general rule. Kras concerned fees, totaling $50, required to secure a discharge in bankruptcy. Id. , at 436. The Court recalled in Kras that "[o]n many occasions we have recognized the fundamental importance . . . under our Constitution" of "the associational interests that surround the establishment and dissolution of th[e] [marital] relationship." Id., at 444.[6] But bankruptcy discharge entails no "fundamental *115 interest," we said. Id., at 445. Although "obtaining [a] desired new start in life [is] important," that interest, the Court explained, "does not rise to the same constitutional level" as the interest in establishing or dissolving a marriage. Ibid.[7] Nor is resort to court the sole path to securing debt forgiveness, we stressed; in contrast, termination of a marriage, we reiterated, requires access to the State's judicial machinery. Id., at 445-446; see Boddie, 401 U. S., at 376.
In Ortwein v. Schwab, 410 U. S. 656 (1973) (per curiam), the Court adhered to the line drawn in Kras. The appellants in Ortwein sought court review of agency determinations reducing their welfare benefits. Alleging poverty, they challenged, as applied to them, an Oregon statute requiring appellants in civil cases to pay a $25 fee. We summarily affirmed the Oregon Supreme Court's judgment rejecting appellants' challenge. As in Kras, the Court saw no "`fundamental interest .. . gained or lost depending on the availability' of the relief sought by [the complainants]." 410 U. S., at 659 (quoting Kras, 409 U. S., at 445). Absent a fundamental interest or classification attracting heightened scrutiny, we said, the applicable equal protection standard *116 "is that of rational justification," a requirement we found satisfied by Oregon's need for revenue to offset the expenses of its court system. 410 U. S., at 660. We expressly rejected the Ortwein appellants' argument that a fee waiver was required for all civil appeals simply because the State chose to permit in forma pauperis filings in special classes of civil appeals, including appeals from terminations of parental rights. Id. , at 661.
In sum, as Ortwein underscored, this Court has not extended Griffin to the broad array of civil cases. But tellingly, the Court has consistently set apart from the mine run of cases those involving state controls or intrusions on family relationships. In that domain, to guard against undue official intrusion, the Court has examined closely and contextually the importance of the governmental interest advanced in defense of the intrusion. Cf. Moore v. East Cleveland, 431 U. S. 494 (1977).

IV
Choices about marriage, family life, and the upbringing of children are among associational rights this Court has ranked as "of basic importance in our society," Boddie, 401 U. S., at 376, rights sheltered by the Fourteenth Amendment against the State's unwarranted usurpation, disregard, or disrespect. See, for example, Turner v. Safley, 482 U. S. 78 (1987), Zablocki v. Redhail, 434 U. S. 374 (1978), and Loving v. Virginia, 388 U. S. 1 (1967) (marriage); Skinner v. Oklahoma ex rel. Williamson, 316 U. S. 535 (1942) (procreation); Pierce v. Society of Sisters, 268 U. S. 510 (1925), and Meyer v. Nebraska, 262 U. S. 390 (1923) (raising children). M. L. B.'s case, involving the State's authority to sever permanently a parent-child bond,[8] demands the close consideration *117 the Court has long required when a family association so undeniably important is at stake. We approach M. L. B.'s petition mindful of the gravity of the sanction imposed on her and in light of two prior decisions most immediately in point: Lassiter v. Department of Social Servs. of Durham Cty., 452 U. S. 18 (1981), and Santosky v. Kramer, 455 U. S. 745 (1982).
Lassiter concerned the appointment of counsel for indigent persons seeking to defend against the State's termination of their parental status. The Court held that appointed counsel was not routinely required to assure a fair adjudication; instead, a case-by-case determination of the need for counsel would suffice, an assessment to be made "in the first instance by the trial court, subject . . . to appellate review." 452 U. S., at 32.
For probation-revocation hearings where loss of conditional liberty is at issue, the Lassiter Court observed, our precedent is not doctrinaire; due process is provided, we have held, when the decision whether counsel should be appointed is made on a case-by-case basis. See Gagnon v. Scarpelli, 411 U. S. 778, 790 (1973). In criminal prosecutions that do not lead to the defendant's incarceration, however, our precedent recognizes no right to appointed counsel. See Scott v. Illinois, 440 U. S., at 373-374. Parental termination cases, the Lassiter Court concluded, are most appropriately ranked with probation-revocation hearings: While the Court declined to recognize an automatic right to appointed counsel, it said that an appointment would be due when warranted by the character and difficulty of the case. See Lassiter, 452 U. S., at 31-32.[9]
Significant to the disposition of M. L. B.'s case, the Lassiter Court considered it "plain . . . that a parent's desire for *118 and right to `the companionship, care, custody, and management of his or her children' is an important interest," one that "`undeniably warrants deference and, absent a powerful countervailing interest, protection.' " Id., at 27 (quoting Stanley v. Illinois, 405 U. S. 645, 651 (1972)). The object of the proceeding is "not simply to infringe upon [the parent's] interest," the Court recognized, "but to end it"; thus, a decision against the parent "work[s] a unique kind of deprivation." Lassiter, 452 U. S., at 27. For that reason, "[a] parent's interest in the accuracy and justice of the decision . . . is . . . a commanding one." Ibid.; see also id., at 39 (Blackmun, J., dissenting) ("A termination of parental rights is both total and irrevocable. Unlike other custody proceedings, it leaves the parent with no right to visit or communicate with the child . . . ." (footnote omitted)).
Santosky held that a "clear and convincing" proof standard is constitutionally required in parental termination proceedings. 455 U. S., at 769-770.[10] In so ruling, the Court again emphasized that a termination decree is "final and irrevocable." Id., at 759 (emphasis in original). "Few forms of state action," the Court said, "are both so severe and so irreversible." Ibid.[11] As in Lassiter, the Court characterized the parent's interest as "commanding," indeed, *119 "far more precious than any property right." 455 U. S., at 758-759.
Although both Lassiter and Santosky yielded divided opinions, the Court was unanimously of the view that "the interest of parents in their relationship with their children is sufficiently fundamental to come within the finite class of liberty interests protected by the Fourteenth Amendment." 455 U. S., at 774 (Rehnquist, J., dissenting). It was also the Court's unanimous view that "[f]ew consequences of judicial action are so grave as the severance of natural family ties." Id., at 787.

V
Guided by this Court's precedent on an indigent's access to judicial processes in criminal and civil cases, and on proceedings to terminate parental status, we turn to the classification question this case presents: Does the Fourteenth Amendment require Mississippi to accord M. L. B. access to an appealavailable but for her inability to advance required costsbefore she is forever branded unfit for affiliation with her children? Respondents urge us to classify M. L. B.'s case with the generality of civil cases, in which indigent persons have no constitutional right to proceed in forma pauperis. See supra, at 114-116. M. L. B., on the other hand, maintains that the accusatory state action she is trying to fend off[12] is barely distinguishable from criminal condemnation in view of the magnitude and permanence of the loss she faces. Cf. In re Gault, 387 U. S. 1, 50, 55 (1967) (resisting "feeble enticement of the `civil' label-of-convenience," and holding that Fifth Amendment's safeguard against self-incrimination applies in juvenile proceedings). See also Santosky, 455 U. S., at 756, 760 (recognizing stigmatic effect of parental status termination decree: "[I]t entails a judicial determination that [a parent is] unfit to raise [her] own children."). For the purpose at hand, M. L. B. *120 asks us to treat her parental termination appeal as we have treated petty offense appeals; she urges us to adhere to the reasoning in Mayer v. Chicago, 404 U. S. 189 (1971), see supra, at 111-112, and rule that Mississippi may not withhold the transcript M. L. B. needs to gain review of the order ending her parental status. Guided by Lassiter and Santosky, and other decisions acknowledging the primacy of the parent-child relationship, e. g., Stanley v. Illinois, 405 U. S., at 651; Meyer v.Nebraska, 262 U. S., at 399, we agree that the Mayer decision points to the disposition proper in this case.
We observe first that the Court's decisions concerning access to judicial processes, commencing with Griffin and running through Mayer, reflect both equal protection and due process concerns. See Ross v. Moffitt, 417 U. S., at 608-609. As we said in Bearden v. Georgia, 461 U. S. 660, 665 (1983), in the Court's Griffin -line cases, "[d]ue process and equal protection principles converge." The equal protection concern relates to the legitimacy of fencing out would-be appellants based solely on their inability to pay core costs. See Griffin, 351 U. S., at 23 (Frankfurter, J., concurring in judgment) (cited supra, at 110-111). The due process concern homes in on the essential fairness of the state-ordered proceedings anterior to adverse state action. See Ross, 417 U. S., at 609. A "precise rationale" has not been composed, id. , at 608, because cases of this order "cannot be resolved by resort to easy slogans or pigeonhole analysis," Bearden, 461 U. S., at 666. Nevertheless, "[m]ost decisions in this area," we have recognized, "res[t] on an equal protection framework," id., at 665, as M. L. B.'s plea heavily does, for, as we earlier observed, see supra, at 110, due process does not independently require that the State provide a right to appeal. We place this case within the framework established by our past decisions in this area. In line with those decisions, we inspect the character and intensity of the individual interest at stake, on the one hand, and the State's *121 justification for its exaction, on the other. See Bearden, 461 U. S., at 666-667.
We now focus on Mayer and the considerations linking that decision to M. L. B.'s case. Mayer, described supra, at 111-112, applied Griffin to a petty offender, fined a total of $500, who sought to appeal from the trial court's judgment. See Mayer, 404 U. S., at 190. An "impecunious medical student," id., at 197, the defendant in Mayer could not pay for a transcript. We held that the State must afford him a record complete enough to allow fair appellate consideration of his claims. The defendant in Mayer faced no term of confinement, but the conviction, we observed, could affect his professional prospects and, possibly, even bar him from the practice of medicine. Ibid. The State's pocketbook interest in advance payment for a transcript, we concluded, was unimpressive when measured against the stakes for the defendant. Ibid. 
Similarly here, the stakes for petitioner M. L. B.forced dissolution of her parental rightsare large, "`more substantial than mere loss of money.' " Santosky, 455 U. S., at 756 (quoting Addington v. Texas, 441 U. S. 418, 424 (1979)). In contrast to loss of custody, which does not sever the parentchild bond, parental status termination is "irretrievabl[y] destructi[ve]" of the most fundamental family relationship. Santosky, 455 U. S., at 753. And the risk of error, Mississippi's experience shows, is considerable. See supra, at 109, n. 3.
Consistent with Santosky, Mississippi has, by statute, adopted a "clear and convincing proof" standard for parental status termination cases. Miss. Code Ann. § 93-15-109 (Supp. 1996). Nevertheless, the Chancellor's termination order in this case simply recites statutory language; it describes no evidence, and otherwise details no reasons for finding M. L. B. "clear[ly] and convincing[ly]" unfit to be a parent. See supra, at 107-108. Only a transcript can reveal to judicial minds other than the Chancellor's the sufficiency, *122 or insufficiency, of the evidence to support his stern judgment.
The countervailing government interest, as in Mayer, is financial. Mississippi urges, as the justification for its appeal cost prepayment requirement, the State's legitimate interest in offsetting the costs of its court system. Brief for Respondents 4, 8, n. 1, 27-30. But in the tightly circumscribed category of parental status termination cases, cf. supra, at 118, n. 11, appeals are few, and not likely to impose an undue burden on the State. See Brief for Petitioner 20, 25 (observing that only 16 reported appeals in Mississippi from 1980 until 1996 referred to the State's termination statute, and only 12 of those decisions addressed the merits of the grant or denial of parental rights); cf. Brief for Respondents 28 (of 63,765 civil actions filed in Mississippi Chancery Courts in 1995, 194 involved termination of parental rights; of cases decided on appeal in Mississippi in 1995 (including Court of Appeals and Supreme Court cases), 492 were first appeals of criminal convictions, 67 involved domestic relations, 16 involved child custody). Mississippi's experience with criminal appeals is noteworthy in this regard. In 1995, the Mississippi Court of Appeals disposed of 298 first appeals from criminal convictions, Sup. Ct. of Miss. Ann. Rep. 42 (1995); of those appeals, only seven were appeals from misdemeanor convictions, ibid., notwithstanding our holding in Mayer requiring in forma pauperis transcript access in petty offense prosecutions.[13]
*123 In States providing criminal appeals, as we earlier recounted, an indigent's access to appeal, through a transcript of relevant trial proceedings, is secure under our precedent. See supra, at 110-112. That equal access right holds for petty offenses as well as for felonies. But counsel at state expense, we have held, is a constitutional requirement, even in the first instance, only when the defendant faces time in confinement. See supra, at 113. When deprivation of parental status is at stake, however, counsel is sometimes part of the process that is due. See Lassiter, 452 U. S., at 31-32. It would be anomalous to recognize a right to a transcript needed to appeal a misdemeanor convictionthough trial counsel may be flatly deniedbut hold, at the same time, that a transcript need not be prepared for M. L. B.though were her defense sufficiently complex, state-paid counsel, as Lassiter instructs, would be designated for her.
In aligning M. L. B.'s case and Mayer parental status termination decrees and criminal convictions that carry no jail timefor appeal access purposes, we do not question the general rule, stated in Ortwein, that fee requirements ordinarily are examined only for rationality. See supra, at 115-116. The State's need for revenue to offset costs, in the mine run of cases, satisfies the rationality requirement, see Ortwein, 410 U. S., at 660; States are not forced by the Constitution to adjust all tolls to account for "disparity in material *124 circumstances." Griffin, 351 U. S., at 23 (Frankfurter, J., concurring in judgment).
But our cases solidly establish two exceptions to that general rule. The basic right to participate in political processes as voters and candidates cannot be limited to those who can pay for a license.[14] Nor may access to judicial processes in cases criminal or "quasi criminal in nature," Mayer, 404 U. S., at 196 (citation and internal quotation marks omitted), turn on ability to pay. In accord with the substance and sense of our decisions in Lassiter and Santosky, see supra, at 117-120, we place decrees forever terminating parental rights in the category of cases in which the State may not "bolt the door to equal justice," Griffin, 351 U. S., at 24 (Frankfurter, J., concurring in judgment); see supra, at 110.

VI
In numerous cases, respondents point out, the Court has held that government "need not provide funds so that people *125 can exercise even fundamental rights." Brief for Respondents 12; see, e. g., Lyng v. Automobile Workers, 485 U. S. 360, 363, n. 2, 370-374 (1988) (rejecting equal protection attack on amendment to Food Stamp Act providing that no household could become eligible for benefits while a household member was on strike); Regan v. Taxation with Representation of Wash., 461 U. S. 540, 543-544, 550-551 (1983) (rejecting nonprofit organization's claims of free speech and equal protection rights to receive tax deductible contributions to support its lobbying activity); Harris v. McRae, 448 U. S. 297, 321-326 (1980) (Medicaid funding need not be provided for women seeking medically necessary abortions). A decision for M. L. B., respondents contend, would dishonor our cases recognizing that the Constitution "generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual." DeShaney v. Winnebago County Dept. of Social Servs., 489 U. S. 189, 196 (1989).
Complainants in the cases on which respondents rely sought state aid to subsidize their privately initiated action or to alleviate the consequences of differences in economic circumstances that existed apart from state action. M. L. B.'s complaint is of a different order. She is endeavoring to defend against the State's destruction of her family bonds, and to resist the brand associated with a parental unfitness adjudication. Like a defendant resisting criminal conviction, she seeks to be spared from the State's devastatingly adverse action. That is the very reason we have paired her case with Mayer, not with Ortwein or Kras, discussed supra, at 114-116.
Respondents also suggest that Washington v. Davis, 426 U. S. 229 (1976), is instructive because it rejects the notion "that a law, neutral on its face and serving ends otherwise *126 within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another," id., at 242. "This must be all the more true," respondents urge, "with respect to an allegedly disparate impact on a class [here, the poor] that, unlike race, is not suspect." Brief for Respondents 31.
Washington v. Davis, however, does not have the sweeping effect respondents attribute to it. That case involved a verbal skill test administered to prospective Government employees. "[A] far greater proportion of blacksfour times as manyfailed the test than did whites." 426 U. S., at 237. But the successful test takers included members of both races, as did the unsuccessful examinees. Disproportionate impact, standing alone, the Court held, was insufficient to prove unconstitutional racial discrimination. Were it otherwise, a host of laws would be called into question, "a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." Id., at 248.
To comprehend the difference between the case at hand and cases controlled by Washington v. Davis,[15] one need look no further than this Court's opinion in Williams v. Illinois, 399 U. S. 235 (1970). Williams held unconstitutional an Illinois law under which an indigent offender could be continued in confinement beyond the maximum prison term specified by statute if his indigency prevented him from satisfying the monetary portion of the sentence. The Court described that law as "`nondiscriminatory on its face,' " and recalled that the law found incompatible with the Constitution in Griffin had been so characterized. 399 U. S., at 242 (quoting Griffin, 351 U. S., at 17, n. 11); see Griffin, 351 U. S., at 17, n. 11 *127 ("[A] law nondiscriminatory on its face may be grossly discriminatory in its operation."). But the Williams Court went on to explain that "the Illinois statute in operative effect exposes only indigents to the risk of imprisonment beyond the statutory maximum." 399 U. S., at 242 (emphasis added). Sanctions of the Williams genre, like the Mississippi prescription here at issue, are not merely disproportionate in impact. Rather, they are wholly contingent on one's ability to pay, and thus "visi[t] different consequences on two categories of persons," ibid.; they apply to all indigents and do not reach anyone outside that class.
In sum, under respondents' reading of Washington v. Davis, our overruling of the Griffin line of cases would be two decades overdue. It suffices to point out that this Court has not so conceived the meaning and effect of our 1976 "disproportionate impact" precedent. See Bearden v. Georgia, 461 U. S., at 664-665 (adhering in 1983 to "Griffin `s principle of `equal justice' ").[16]
Respondents and the dissenters urge that we will open floodgates if we do not rigidly restrict Griffin to cases typed "criminal." See post, at 141-144 (Thomas, J., dissenting); Brief for Respondents 27-28. But we have repeatedly noticed what sets parental status termination decrees apart from mine run civil actions, even from other domestic relations matters such as divorce, paternity, and child custody. See supra, at 117-120, and n. 11. To recapitulate, termination decrees "wor[k] a unique kind of deprivation." Lassiter, 452 U. S., at 27. In contrast to matters modifiable at *128 the parties' will or based on changed circumstances, termination adjudications involve the awesome authority of the State "to destroy permanently all legal recognition of the parental relationship." Rivera, 483 U. S., at 580. Our Lassiter and Santosky decisions, recognizing that parental termination decrees are among the most severe forms of state action, Santosky, 455 U. S., at 759, have not served as precedent in other areas. See supra, at 118, n. 11. We are therefore satisfied that the label "civil" should not entice us to leave undisturbed the Mississippi courts' disposition of this case. Cf. In re Gault, 387 U. S., at 50.

* * *
For the reasons stated, we hold that Mississippi may not withhold from M. L. B. "a `record of sufficient completeness' to permit proper [appellate] consideration of [her] claims." Mayer, 404 U. S., at 198. Accordingly, we reverse the judgment of the Supreme Court of Mississippi and remand the case for further proceedings not inconsistent with this opinion.
It is so ordered. 
Justice Kennedy, concurring in the judgment.
The Court gives a most careful and comprehensive recitation of the precedents from Griffin v. Illinois, 351 U. S. 12 (1956), through Mayer v. Chicago, 404 U. S. 189 (1971), and beyond, a line of decisions which invokes both equal protection and due process principles. The duality, as the Court notes, stems from Griffin itself, which produced no opinion for the Court and invoked strands of both constitutional doctrines.
In my view the cases most on point, and the ones which persuade me we must reverse the judgment now reviewed, are the decisions addressing procedures involving the rights and privileges inherent in family and personal relations. *129 These are Boddie v. Connecticut, 401 U. S. 371 (1971); Lassiter v. Department of Social Servs. of Durham Cty., 452 U. S. 18 (1981); and Santosky v. Kramer, 455 U. S. 745 (1982), all cases resting exclusively upon the Due Process Clause. Here, due process is quite a sufficient basis for our holding.
I acknowledge the authorities do not hold that an appeal is required, even in a criminal case; but given the existing appellate structure in Mississippi, the realities of the litigation process, and the fundamental interests at stake in this particular proceeding, the State may not erect a bar in the form of transcript and filing costs beyond this petitioner's means. The Court well describes the fundamental interests the petitioner has in ensuring that the order which terminated all her parental ties was based upon a fair assessment of the facts and the law. See Mathews v. Eldridge, 424 U. S. 319, 335 (1976). With these observations, I concur in the judgment.
Chief Justice Rehnquist, dissenting.
I join all but Part II of Justice Thomas' dissenting opinion. For the reasons stated in that opinion, I would not extend the Griffin-Mayer line of cases to invalidate Mississippi's refusal to pay for petitioner's transcript on appeal in this case.
Justice Thomas, with whom Justice Scalia joins, and with whom The Chief Justice joins except as to Part II, dissenting.
Today the majority holds that the Fourteenth Amendment requires Mississippi to afford petitioner a free transcript because her civil case involves a "fundamental" right. The majority seeks to limit the reach of its holding to the type of case we confront here, one involving the termination of parental rights. I do not think, however, that the new-found constitutional right to free transcripts in civil appeals can be *130 effectively restricted to this case. The inevitable consequence will be greater demands on the States to provide free assistance to would-be appellants in all manner of civil cases involving interests that cannot, based on the test established by the majority, be distinguished from the admittedly important interest at issue here. The cases on which the majority relies, primarily cases requiring appellate assistance for indigent criminal defendants, were questionable when decided, and have, in my view, been undermined since. Even accepting those cases, however, I am of the view that the majority takes them too far. I therefore dissent.

I
Petitioner requests relief under both the Due Process and Equal Protection Clauses, though she does not specify how either Clause affords it. The majority accedes to petitioner's request. But, carrying forward the ambiguity in the cases on which it relies, the majority does not specify the source of the relief it grants. Those decisions are said to "reflect both equal protection and due process concerns." Ante, at 120. And, while we are told that "cases of this order `cannot be resolved by resort to easy slogans or pigeonhole analysis,' " ibid. (quoting Bearden v. Georgia, 461 U. S. 660, 666 (1983)), the majority nonetheless acknowledges that "`[m]ost decisions in this area . . . res[t] on an equal protection framework,' " ante, at 120 (quoting Bearden, supra, at 665). It then purports to "place this case within the framework established by our past decisions in this area." Ante, at 120. It is not clear to me whether the majority disavows any due process support for its holding. (Despite the murky disclaimer, the majority discusses numerous cases that squarely relied on due process considerations.) I therefore analyze petitioner's claim under both the Due Process and Equal Protection Clauses. If neither Clause affords petitioner the right to a free, civil-appeal transcript, I assume that no amalgam of the two does.

*131 A
We have indicated on several occasions in this century that the interest of parents in maintaining their relationships with their children is "an important interest that `undeniably warrants deference and, absent a powerful countervailing interest, protection.' " Lassiter v. Department of Social Servs. of Durham Cty., 452 U. S. 18, 27 (1981) (quoting Stanley v. Illinois, 405 U. S. 645, 651 (1972)). Assuming that petitioner's interest may not be impinged without due process of law, I do not think that the Due Process Clause requires the result the majority reaches.
Petitioner's largest obstacle to a due process appeal gratis is our oft-affirmed view that due process does not oblige States to provide for any appeal, even from a criminal conviction. See, e. g., Griffin v. Illinois, 351 U. S. 12, 18 (1956) (plurality opinion) (noting that "a State is not required by the Federal Constitution to provide appellate courts or a right to appellate review at all" (citation omitted)); McKane v. Durston, 153 U. S. 684, 687 (1894) ("A review by an appellate court of the final judgment in a criminal case, however grave the offence of which the accused is convicted, was not at common law and is not now a necessary element of due process of law. It is wholly within the discretion of the State to allow or not to allow such a review. A citation of authorities upon the point is unnecessary"). To be sure, we have indicated, beginning with Griffin v. Illinois, that where an appeal is provided, States may be prohibited from erecting barriers to those unable to pay. As I described last Term in my concurring opinion in Lewis v. Casey, 518 U. S. 343, 368373 (1996), however, I believe that these cases are best understood as grounded in equal protection analysis, and thus make no inroads on our longstanding rule that States that accord due process in a hearing-level tribunal need not provide further review.
The majority reaffirms that due process does not require an appeal. Ante, at 110, 120. Indeed, as I noted above, it *132 is not clear that the majority relies on the Due Process Clause at all. The majority does discuss, however, one case in which the Court stated its holding in terms of due process: Boddie v. Connecticut, 401 U. S. 371 (1971). In Boddie, the Court held violative of due process a Connecticut statute that exacted fees averaging $60 from persons seeking marital dissolution. Citing the importance of the interest in ending a marriage, and the State's monopoly over the mechanisms to accomplish it, we explained that, "at a minimum" and "absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." Id., at 377. Boddie has little to do with this case. It, "of course, was not concerned with post-hearing review." Ortwein v. Schwab, 410 U. S. 656, 659 (1973). Rather, the concern in Boddie was that indigent persons were deprived of "fundamental rights" with no hearing whatsoever. Petitioner, in contrast, received not merely a hearing, but in fact enjoyed procedural protections above and beyond what our parental termination cases have required. She received both notice and a hearing before a neutral, legally trained decisionmaker. She was represented by counseleven though due process does not in every case require the appointment of counsel. See Lassiter , supra, at 24. Through her attorney, petitioner was able to confront the evidence and witnesses against her. And, in accordance with Santosky v. Kramer, 455 U. S. 745, 769 (1982), the Chancery Court was required to find that petitioner's parental unfitness was proved by clear and convincing evidence. Indeed, petitioner points to no hearinglevel process to which she was entitled that she did not receive.
Given the many procedural protections afforded petitioner, I have little difficulty concluding that "due process has . . . been accorded in the tribunal of first instance." Ohio ex rel. Bryant v. Akron Metropolitan Park Dist., 281 U. S. 74, 80 *133 (1930). Due process has never compelled an appeal where, as here, its rigors are satisfied by an adequate hearing. Those cases in which the Court has required States to alleviate financial obstacles to process beyond a hearingthough sometimes couched in due process termshave been based on the equal protection proposition that if the State chooses to provide for appellate review, it "`can no more discriminate on account of poverty than on account of religion, race, or color.' " Lewis v. Casey, supra, at 371 (Thomas, J., concurring) (quoting Griffin v. Illinois, supra, at 17 (plurality opinion)) (footnote omitted). There seems, then, no place in the Due Process Clausecertainly as an original matter, and even as construed by this Courtfor the constitutional "right" crafted by the majority today. I turn now to the other possible source: The Equal Protection Clause.

B
As I stated last Term in Lewis v. Casey, I do not think that the equal protection theory underlying the Griffin line of cases remains viable. See 518 U. S., at 373-378. There, I expressed serious reservations as to the continuing vitality of Bounds v. Smith, 430 U. S. 817 (1977) (requiring prison authorities to provide prisoners with adequate law libraries or legal assistance). As it did in Bounds, the Court today not only adopts the equal protection theory of Griffin v. Illinois which was dubious ab initio and which has been undermined sincebut extends it. Thus, much of what I said in Lewis v. Casey bears repeating here.
In Griffin, the State of Illinois required all criminal appellants whose claims on appeal required review of a trial transcript to obtain it themselves. The plurality thought that this "discriminate[d] against some convicted defendants on account of their poverty," 351 U. S., at 18 (plurality opinion). Justice Harlan, in dissent, perceived a troubling shift in this Court's equal protection jurisprudence. The Court, he noted, did not "dispute either the necessity for a bill of exceptions *134 or the reasonableness of the general requirement that the trial transcript, if used in its preparation, be paid for by the appealing party." Id., at 35. But, because requiring each would-be appellant to bear the costs of appeal hit the poor harder, the majority divined "an invidious classification between the `rich' and the `poor.' " Ibid. Disputing this early manifestation of the "disparate impact" theory of equal protection, Justice Harlan argued:
"[N]o economic burden attendant upon the exercise of a privilege bears equally upon all, and in other circumstances the resulting differentiation is not treated as an invidious classification by the State, even though discrimination against `indigents' by name would be unconstitutional." Ibid. 
Justice Harlan offered the example of a state university that conditions an education on the payment of tuition. If charging tuition did not create a discriminatory classification, then, Justice Harlan wondered, how did any other reasonable exaction by a State for a service it provides? "The resulting classification would be invidious in all cases, and an invidious classification offends equal protection regardless of the seriousness of the consequences." Ibid. (emphasis deleted). The issue in Griffin was not whether Illinois had made a reasonable classification, but whether the State acted reasonably in failing to remove disabilities that existed wholly independently of state action. To Justice Harlan this was not an inquiry typically posed under the Equal Protection Clause.
In Douglas v. California, 372 U. S. 353 (1963), Justice Harlan again confronted what Justice Clark termed the Court's "fetish for indigency," id., at 359 (dissenting opinion). Regarding a law limiting the appointment of appellate counsel for indigents, Justice Harlan pointed out that "[l]aws such as these do not deny equal protection to the less fortunate for one essential reason: the Equal Protection Clause does not impose on the States `an affirmative duty to lift the handicaps *135 flowing from differences in economic circumstances.' " Id., at 362 (dissenting opinion) (footnote omitted).
Justice Harlan's views were accepted by the Court in Washington v. Davis, 426 U. S. 229 (1976), in which "[w]e rejected a disparate impact theory of the Equal Protection Clause altogether." Lewis v. Casey, supra, at 375 (concurring opinion). We spurned the claim that "a law, neutral on its face and serving ends otherwise within the power of government to pursue, is invalid under the Equal Protection Clause simply because it may affect a greater proportion of one race than of another." 426 U. S., at 242. Absent proof of discriminatory purpose, official action did not violate the Fourteenth Amendment "solely because it has a racially disparate impact." Id., at 239 (emphasis in original). Hearkening back to Justice Harlan's dissents in Griffin and Douglas, we recognized that
"[a] rule that a statute designed to serve neutral ends is nevertheless invalid, absent compelling justification, if in practice it benefits or burdens one race more than another would be far reaching and would raise serious questions about, and perhaps invalidate, a whole range of tax, welfare, public service, regulatory, and licensing statutes that may be more burdensome to the poor and to the average black than to the more affluent white." 426 U. S., at 248 (footnote omitted).
The lesson of Davis is that the Equal Protection Clause shields only against purposeful discrimination: A disparate impact, even upon members of a racial minority, the classification of which we have been most suspect, does not violate equal protection. The Clause is not a panacea for perceived social or economic inequity; it seeks to "guarante[e] equal laws, not equal results." Personnel Administrator of Mass. v. Feeney, 442 U. S. 256, 273 (1979).
Since Davis, we have regularly required more of an equal protection claimant than a showing that state action has a *136 harsher effect on him or her than on others. See, e. g., Harris v. McRae, 448 U. S. 297, 324, n. 26 (1980) ("The equal protection component of the Fifth Amendment prohibits only purposeful discrimination, and when a facially neutral federal statute is challenged on equal protection grounds, it is incumbent upon the challenger to prove that Congress selected or reaffirmed a particular course of action at least in part because of, not merely in spite of, its adverse effects upon an identifiable group" (internal quotation marks and citations omitted)); see also Lewis v. Casey, 518 U. S., at 375 (concurring opinion) (citing cases). Our frequent pronouncements that the Fourteenth Amendment is not violated by disparate impact have spanned challenges to statutes alleged to affect disproportionately members of one race, Washington v. Davis, supra; members of one sex, Personnel Administrator v. Feeney, supra; and poor persons seeking to exercise protected rights, Harris v. McRae, supra; Maher v. Roe, 432 U. S. 464, 470-471 (1977).
The majority attempts to avoid what I regard as the irresistible force of the Davis line of cases, but I am unconvinced by the effort. The majority states that persons in cases like those cited above "sought state aid to subsidize their privately initiated action or to alleviate the consequences of differences in economic circumstances that existed apart from state action." Ante, at 125. Petitioner, in apparent contrast, "is endeavoring to defend against the State's destruction of her family bonds, and to resist the brand associated with a parental unfitness adjudication." Ibid. She, "[l]ike a defendant resisting criminal conviction, . . . seeks to be spared from the State's devastatingly adverse action." Ibid. But, also like a defendant resisting criminal conviction, petitioner is not constitutionally entitled to post-trial process. See ante, at 110, 120. She defended against the "destruction of her family bonds" in the Chancery Court hearing at which she was accorded all the process this Court has required of the States in parental termination cases. She now desires "state aid to subsidize [her] privately initiated" *137 appealan appeal that neither petitioner nor the majority claims Mississippi is required to provideto overturn the determination that resulted from that hearing. I see no principled difference between a facially neutral rule that serves in some cases to prevent persons from availing themselves of state employment, or a state-funded education, or a state-funded abortioneach of which the State may, but is not required to, provideand a facially neutral rule that prevents a person from taking an appeal that is available only because the State chooses to provide it.
Nor does Williams v. Illinois, 399 U. S. 235 (1970), a case decided six years earlier, operate to limit Washington v. Davis. Williams was yet another manifestation of the "equalizing" notion of equal protection that this Court began to question in Davis. See Williams, supra, at 260 (Harlan, J., concurring in result). To the extent its reasoning survives Davis, I think that Williams is distinguishable. Petitioner Williams was incarcerated beyond the maximum statutory sentence because he was unable to pay the fine imposed as part of his sentence. We found the law that permitted prisoners to avoid extrastatutory imprisonment only by paying their fines to violate the Equal Protection Clause. Even though it was "`nondiscriminatory on its face,' " the law "work[ed] an invidious discrimination" as to Williams and all other indigents because they could not afford to pay their fines. 399 U. S., at 242. The majority concludes that the sanctions involved in Williams are analogous to "the Mississippi prescription here at issue," in that both do not have merely a disparate impact, "they apply to all indigents and do not reach anyone outside that class." Ante, at 127. Even assuming that Williams' imprisonment gave rise to an equal protection violation, however, M. L. B.'s circumstances are not comparable. M. L. B.'s parental rights were terminatedthe analog to Williams' extended imprisonmentbecause the Chancery Court found, after a hearing, that she was unfit to remain her children's mother, not because she was indigent. Her indigency only prevented her from taking *138 advantage of procedures above and beyond those required by the Constitutionin the same way that indigency frequently prevents persons from availing themselves of a variety of state services.[1]
The Griffin line of cases ascribed toone might say announcedan equalizing notion of the Equal Protection Clause that would, I think, have startled the Fourteenth Amendment's Framers. In those cases, the Court did not find, nor did it seek, any purposeful discrimination on the part of the state defendants. That their statutes had disproportionate effect on poor persons was sufficient for us to find a constitutional violation. In Davis, among other cases, we began to recognize the potential mischief of a disparate impact theory writ large, and endeavored to contain it. In this case, I would continue that enterprise. Mississippi's requirement of prepaid transcripts in civil appeals seeking to contest the sufficiency of the evidence adduced at trial is facially neutral; it creates no classification. The transcript rule reasonably obliges would-be appellants to bear the costs of availing themselves of a service that the State chooses, but is not constitutionally required, to provide.[2] Any adverse *139 impact that the transcript requirement has on any person seeking to appeal arises not out of the State's action, but out of factors entirely unrelated to it.

II
If this case squarely presented the question, I would be inclined to vote to overrule Griffin and its progeny. Even were I convinced that the cases on which the majority today relies ought to be retained, I could not agree with the majority's extension of them.
The interest at stake in this case differs in several important respects from that at issue in cases such as Griffin. Petitioner's interest in maintaining a relationship with her children is the subject of a civil, not criminal, action. While certain civil suits may tend at the margin toward criminal cases, and criminal cases may likewise drift toward civil suits, the basic distinction between the two finds root in the Constitution and has largely retained its vitality in our jurisprudence. In dissent in Boddie v. Connecticut, Justice Black stated that "in Griffin the Court studiously and carefully refrained from saying one word or one sentence suggesting that the rule there announced to control rights of criminal defendants would control in the quite different field of civil cases." 401 U. S., at 390. The Constitution provides for a series of protections of the unadorned liberty interest at stake in criminal proceedings. These express protections include the Fifth Amendment's guarantee of grand jury indictment, and protection against double jeopardy and selfincrimination; the Sixth Amendment's guarantees of a speedy and public jury trial, of the ability to confront witnesses, and of compulsory process and assistance of counsel; and the Eighth Amendment's protections against excessive bail and fines, and against cruel and unusual punishment. This Court has given content to these textual protections, and has identified others contained in the Due Process Clause. These protections are not available to the typical *140 civil litigant. Even where the interest in a civil suit has been labeled "fundamental," as with the interest in parental termination suits, the protections extended pale by comparison. A party whose parental rights are subject to termination is entitled to appointed counsel, but only in certain circumstances. See Lassiter, 452 U. S., at 31-32. His or her rights cannot be terminated unless the evidence meets a standard higher than the preponderance standard applied in the typical civil suit, but the standard is still lower than that required before a guilty verdict. See Santosky v. Kramer, 455 U. S., at 769-770.
That said, it is true enough that civil and criminal cases do not always stand in bold relief to one another. Mayer v. Chicago, 404 U. S. 189 (1971), marks a particularly discomfiting point along the border between the civil and criminal areas. Based on Griffin, the Court determined there that an indigent defendant had a constitutional right to a free transcript in aid of appealing his conviction for violating city ordinances, which resulted in a $500 fine and no imprisonment. In Scott v. Illinois, 440 U. S. 367 (1979), we concluded that an indigent defendant charged with a crime that was not punishable by imprisonment was not entitled to appointed counsel. And yet, in Lassiter, supra, we held that, in some cases, due process required provision of assistance of counsel before the termination of parental rights. The assertion that civil litigants have no right to the free transcripts that all criminal defendants enjoy is difficult to sustain in the face of our holding that some civil litigants are entitled to the assistance of counsel to which some criminal defendants are not. It is at this unsettled (and unsettling) place that the majority lays the foundation of its holding. See ante, at 120-124. The majority's solution to the "anamol[y]" that a misdemeanant receives a free transcript but no trial counsel, while a parental-rights terminee receives (sometimes) trial counsel, but no transcript, works an extension of Mayer. I *141 would answer the conundrum differently: Even if the Griffin line were sound, Mayer was an unjustified extension that should be limited to its facts, if not overruled.
Unlike in Scott and Lassiter, the Court gave short shrift in Mayer to the distinction, as old as our Constitution, between crimes punishable by imprisonment and crimes punishable merely by fines. See Lassiter, supra, at 26-27; Scott, supra, at 373. Even though specific text-based constitutional protections have been withheld in cases not involving the prospect of imprisonment, the Court found the difference of no moment in Mayer. The Court reasoned that "[t]he invidiousness of the discrimination that exists when criminal procedures are made available only to those who can pay is not erased by any differences in the sentences that may be imposed." 404 U. S., at 197. We reap today what we sowed then. If requiring payment for procedures (e. g., appeals) that are not themselves required is invidious discrimination no matter what sentence results, it is difficult to imagine why it is not invidious discrimination no matter what results and no matter whether the procedures involve a criminal or civil case. See supra, at 135. To me this points up the difficulty underlying the entire Griffin line. Taking the Griffin line as a given, however, and in the absence of any obvious limiting principle, I would restrict it to the criminal appeals to which its authors, see Boddie v. Connecticut, 401 U. S., at 389 (Black, J., dissenting), sought to limit it.
The distinction between criminal and civil casesif blurred at the marginshas persisted throughout the law. The distinction that the majority seeks to draw between the case we confront today and the other civil cases that we will surely face tomorrow is far more ephemeral. If all that is required to trigger the right to a free appellate transcript is that the interest at stake appear to us to be as fundamental as the interest of a convicted misdemeanant, several kinds of civil suits involving interests that seem fundamental *142 enough leap to mind. Will the Court, for example, now extend the right to a free transcript to an indigent seeking to appeal the outcome of a paternity suit?[3] To those who wish to appeal custody determinations?[4] How about persons against whom divorce decrees are entered?[5] Civil suits that arise out of challenges to zoning ordinances with an impact on families?[6] Why not foreclosure actionsor at least foreclosure *143 actions seeking to oust persons from their homes of many years?[7]
The majority seeks to provide assurances that its holding will not extend beyond parental termination suits. The holdings of Santosky and Lassiter both of which involved parental terminationhave not, we are told, been applied to other areas of law. Ante, at 128. This is not comforting. Both Santosky and Lassiter are cases that determined the requirements of due process (not equal protection) in the parental rights termination area. As the Court has said countless times, the requirements of due process vary considerably with the interest involved and the action to which it is subject. It is little wonder, then, that the specific due process requirements for one sort of action are not readily transferable to others. I have my doubts that today's opinion will be so confined. In the first place, it is not clear whether it is an equal protection or a due process opinion. Moreover, the principle on which it appears to rest hardly seems capable of stemming the tide. Petitioner is permitted a free appellate transcript because the interest that underlies her civil claim compares favorably to the interest of the misdemeanant facing a $500 fine and unknown professional difficulties in Mayer v. Chicago. Under the rule announced today, I do not see how a civil litigant could constitutionally be denied a free transcript in any case that involves an interest that is arguably as important as the interest in Mayer (which would appear to include all the types of cases that I mention above, and perhaps many others).[8] What is more, it must be remembered that Griffin did not merely invent *144 the free transcript right for criminal appellants; it was also the launching pad for the discovery of a host of other rights. See, e. g., Bounds, 430 U. S., at 822 (right to prison law libraries or legal assistance); Douglas, 372 U. S., at 356 (right to free appellate counsel). I fear that the growth of Griffin in the criminal area may be mirrored in the civil area.
In brushing aside the distinction between criminal and civil casesthe distinction that has constrained Griffin for 40 yearsthe Court has eliminated the last meaningful limit on the free-floating right to appellate assistance. From Mayer, an unfortunate outlier in the Griffin line, has sprung the M. L. B. line, and I have no confidence that the majority's assurances that the line starts and ends with this case will hold true.

III
As the majority points out, many States already provide for in forma pauperis civil appeals, with some making special allowances for parental termination cases. I do not dispute the wisdom or charity of these heretofore voluntary allocations of the various States' scarce resources. I agree that, for manyif not mostparents, the termination of their right to raise their children would be an exaction more dear than any other. It seems perfectly reasonable for States to choose to provide extra constitutional procedures to ensure that any such termination is undertaken with care. I do not agree, however, that a State that has taken the step, not required by the Constitution, of permitting appeals from termination decisions somehow violates the Constitution when it charges reasonable fees of all would-be appellants. I respectfully dissent.
NOTES
[*] Martha Matthews filed a brief for the National Center for Youth Law et al. as amici curiae. 
[1] Mississippi Code Ann. § 93-15-103(3) (1994) sets forth several grounds for termination of parental rights, including, in subsection (3)(e), "when there is [a] substantial erosion of the relationship between the parent and child which was caused at least in part by the parent's serious neglect, abuse, prolonged and unreasonable absence, unreasonable failure to visit or communicate, or prolonged imprisonment."

M. L. B. notes that, "in repeating the catch-all language of [the statute], the Chancellor said that [she] was guilty of `serious .. . abuse.' " Reply Brief 6, n. 1. "However," M. L. B. adds, "there was no allegation of abuse in the complaint in this case or at any other stage of the proceedings." Ibid. 
[2] In fact, Mississippi, by statute, provides for coverage of transcript fees and other costs for indigents in civil commitment appeals. Miss. Code Ann. § 41-21-83 (Supp. 1996) (record on appeal shall include transcript of commitment hearing); Miss. Code Ann. § 41-21-85 (1972) (all costs of hearing or appeal shall be borne by state board of mental health when patient is indigent).
[3] On the efficacy of appellate review in parental status termination cases, M. L. B. notes that of the eight reported appellate challenges to Mississippi trial court termination orders from 1980 through May 1996, three were reversed by the Mississippi Supreme Court for failure to meet the "clear and convincing" proof standard. Brief for Petitioner 20; see also Reply Brief 6 ("[I]n civil cases generally, the Mississippi Court of Appeals reversed or vacated nearly 39% of the trial court decisions it reviewed in 1995 and the Mississippi Supreme Court reversed or vacated nearly 37%. Supreme Court of Mississippi, 1995 Annual Report, pp. 22, 41.").
[4] See, e. g., Williams v. Oklahoma City, 395 U. S. 458, 458-459 (1969) (per curiam) (transcript needed to perfect appeal must be furnished at state expense to indigent defendant sentenced to 90 days in jail and a $50 fine for drunk driving); Long v. District Court of Iowa, Lee Cty. , 385 U. S. 192, 192-194 (1966) (per curiam) (transcript must be furnished at state expense to enable indigent state habeas corpus petitioner to appeal denial of relief); Smith v. Bennett, 365 U. S. 708, 708-709 (1961) (filing fee to process state habeas corpus application must be waived for indigent prisoner); Burns v. Ohio, 360 U. S. 252, 253, 257-258 (1959) (filing fee for motion for leave to appeal from judgment of intermediate appellate court to State Supreme Court must be waived when defendant is indigent).
[5] Griffin did not impose an inflexible requirement that a State provide a full trial transcript to an indigent defendant pursuing an appeal. See Griffin v. Illinois, 351 U. S. 12, 20 (1956) (State need not purchase a stenographer's transcript in every case where an indigent defendant cannot buy it; State "Supreme Court may find other means of affording adequate and effective appellate review to indigent defendants."). In Draper v. Washington, 372 U. S. 487 (1963), we invalidated a state rule that tied an indigent defendant's ability to obtain a transcript at public expense to the trial judge's finding that the defendant's appeal was not frivolous. Id., at 498-500. We emphasized, however, that the Griffin requirement is not rigid. "Alternative methods of reporting trial proceedings," we observed, "are permissible if they place before the appellate court an equivalent report of the events at trial from which the appellant's contentions arise." 372 U. S., at 495. Moreover, we held, an indigent defendant is entitled only to those parts of the trial record that are "germane to consideration of the appeal." Ibid.; see also Mayer v. Chicago, 404 U. S. 189, 194 (1971) ("A record of sufficient completeness does not translate automatically into a complete verbatim transcript." (internal quotation marks omitted)).
[6] As examples, the Court listed: Eisenstadt v. Baird, 405 U. S. 438, 453 (1972) (right to be free from government interference in deciding whether to bear or beget a child is "fundamenta[l]," and may not be burdened based upon marital status); Loving v. Virginia, 388 U. S. 1, 12 (1967) ("Marriage is [a] `basic civil righ[t],' " and cannot be denied based on a racial classification. (citations omitted)); Griswold v. Connecticut, 381 U. S. 479, 485-486 (1965) (marital relationship "is an association that promotes a way of life, . . . a harmony in living, . . . a bilateral loyalty," and the use of contraception within marriage is protected against government intrusion); Skinner v. Oklahoma ex rel. Williamson, 316 U. S. 535, 541 (1942) (Because the power to sterilize affects "a basic liberty[,] . . . strict scrutiny of the classification which a State makes in a sterilization law is essential."); Meyer v. Nebraska, 262 U. S. 390, 399 (1923) (recognizing liberty interest in raising children). See Kras, 409 U. S., at 444.
[7] The Court ranked the prescription in Kras with economic and social welfare legislation generally, and cited among examples: Jefferson v. Hackney, 406 U. S. 535, 546 (1972) (Texas scheme for allocating limited welfare benefits is a rational legislative "effor[t] to tackle the problems of the poor and the needy."); Richardson v. Belcher, 404 U. S. 78 (1971) (federal statute mandating reductions in Social Security benefits to reflect workers' compensation payments is social welfare regulation that survives rationalbasis review); Dandridge v. Williams, 397 U. S. 471, 483, 487 (1970) (Maryland "maximum grant regulation" limiting family welfare benefits is economic, social welfare regulation that is "rationally based and free from invidious discrimination."); Flemming v. Nestor, 363 U. S. 603, 606, 611 (1960) (The right to receive benefits under the Social Security Act is not "an accrued property right," but Congress may not take away benefits arbitrarily.). See Kras, 409 U. S., at 445-446.
[8] Although the termination proceeding in this case was initiated by private parties as a prelude to an adoption petition, rather than by a state agency, the challenged state action remains essentially the same: M. L. B. resists the imposition of an official decree extinguishing, as no power other than the State can, her parent-child relationships.
[9] The Court noted, among other considerations, that petitions to terminate parental rights may charge criminal activity and that "[p]arents so accused may need legal counsel to guide them in understanding the problems such petitions may create." Lassiter, 452 U. S., at 27, n. 3.
[10] Earlier, in Addington v. Texas, 441 U. S. 418, 431-432 (1979), the Court concluded that the Fourteenth Amendment requires a "clear and convincing" standard of proof in civil commitment proceedings.
[11] In Rivera v. Minnich, 483 U. S. 574 (1987), the Court declined to extend Santosky to paternity proceedings. The Court distinguished the State's imposition of the legal obligations attending a biological relationship between parent and child from the State's termination of a fully existing parent-child relationship. See Rivera, 483 U. S., at 579-582. In drawing this distinction, the Court found it enlightening that state legislatures had similarly separated the two proceedings: Most jurisdictions applied a "preponderance of the evidence" standard in paternity cases, while 38 jurisdictions, at the time Santosky was decided, required a higher standard of proof in proceedings to terminate parental rights. See Rivera, 483 U. S., at 578-579 (citing Santosky, 455 U. S., at 749-750).
[12] See supra, at 116, n. 8.
[13] Many States provide for in forma pauperis appeals, including transcripts, in civil cases generally. See, e. g., Alaska Rule App. Proc. 209(a)(3) (1996); Conn. Rule App. Proc. 4017 (1996); D. C. Code Ann. § 15712 (1995); Idaho Code § 31-3220(5) (1996); Ill. Comp. Stat., ch. 735, § 5/ 5-105.5(b) (Supp. 1996); Ky. Rev. Stat. Ann. § 453.190 (Baldwin 1991); La. Code Civ. Proc. Ann., Art. 5185 (West Supp. 1996); Me. Rule Civ. Proc. 91(f) (1996); Minn. Stat. § 563.01, subd. 7 (1994); Mo. Rev. Stat. § 512.150 (1994); Neb. Rev. Stat. § 25-2306 (1995); Nev. Rev. Stat. § 12.015.2 (1995); N. M. Stat. Ann. § 39-3-12 (1991); N. Y. Civ. Prac. Law § 1102(b) (McKinney 1976); Ore. Rev. Stat. § 21.605(3)(a) (1991); Pa. Rule Jud. Admin. 5000.2(h) (1996); Tex. Rule App. Proc. 53(j)(1) (1996); Vt. Rule App. Proc. 10(b)(4) (1996); Wash. Rule App. Proc. 15.4(d) (1996); W. Va. Code § 59-21(a) (Supp. 1996); State ex rel. Girouard v. Circuit Court for Jackson County, 155 Wis. 2d 148, 454 N. W. 2d 792 (1990).

Several States deal discretely with in forma pauperis appeals, including transcripts, in parental status termination cases. See, e. g., In re Appeal in Pima County v. Howard, 112 Ariz. 170, 540 P. 2d 642 (1975); Cal. Family Code Ann. § 7895(c) (West 1994); Colo. Rev. Stat. § 19-3-609 (Supp. 1996); Nix v. Department of Human Resources, 236 Ga. 794, 225 S. E. 2d 306 (1976); In re Chambers, 261 Iowa 31, 152 N. W. 2d 818 (1967); Kan. Stat. Ann. § 38-1593 (1986); In re Karren, 280 Minn. 377, 159 N. W. 2d 402 (1968); Mich. Rule P. Ct. 5.974(H)(3) (1996); In re Dotson, 72 N. J. 112, 367 A. 2d 1160 (1976); State ex rel. Heller v. Miller, 61 Ohio St. 2d 6, 399 N. E. 2d 66 (1980); Ex parte Cauthen, 291 S. C. 465, 354 S. E. 2d 381 (1987).
[14] The pathmarking voting and ballot access decisions are Harper v. Virginia Bd. of Elections, 383 U. S. 663, 664, 666 (1966) (invalidating, as a denial of equal protection, an annual $1.50 poll tax imposed by Virginia on all residents over 21); Bullock v. Carter, 405 U. S. 134, 135, 145, 149 (1972) (invalidating Texas scheme under which candidates for local office had to pay fees as high as $8,900 to get on the ballot); Lubin v. Panish, 415 U. S. 709, 710, 718 (1974) (invalidating California statute requiring payment of a ballot-access fee fixed at a percentage of the salary for the office sought).

Notably, the Court in Harper recognized that "a State may exact fees from citizens for many different kinds of licenses." 383 U. S., at 668. For example, the State "can demand from all an equal fee for a driver's license." Ibid. But voting cannot hinge on ability to pay, the Court explained, for it is a "`fundamental political right . . . preservative of all rights.' " Id. , at 667 (quoting Yick Wo v. Hopkins, 118 U. S. 356, 370 (1886)). Bullock rejected as justifications for excluding impecunious persons, the State's concern about unwieldy ballots and its interest in financing elections. 405 U. S., at 144-149. Lubin reaffirmed that a State may not require from an indigent candidate "fees he cannot pay." 415 U. S., at 718.
[15] See Personnel Administrator of Mass. v. Feeney, 442 U. S. 256 (1979); Arlington Heights v. Metropolitan Housing Development Corp., 429 U. S. 252 (1977).
[16] Six of the seven Justices in the majority in Washington v. Davis, 426 U. S. 229 (1976), had two Terms before Davis read our decisions in Griffin and related cases to hold that "[t]he State cannot adopt procedures which leave an indigent defendant `entirely cut off from any appeal at all,' by virtue of his indigency, or extend to such indigent defendants merely a `meaningless ritual' while others in better economic circumstances have a `meaningful appeal.' " Ross v. Moffitt, 417 U. S. 600, 612 (1974) (opinion of the Court by Rehnquist, J.) (citations omitted).
[1] Similarly, Harper v. Virginia Bd. of Elections, 383 U. S. 663 (1966), struck down a poll tax that directly restricted the exercise of a right found in that case to be fundamentalthe right to vote in state elections. The fee that M. L. B. is unable to pay does not prevent the exercise of a fundamental right directly: The fundamental interest identified by the majority is not the right to a civil appeal, it is rather the right to maintain the parental relationship.
[2] Petitioner suggests that Mississippi's $2 per page charge exceeds the actual cost of transcription. See Reply Brief for Petitioner 8. She stops short of asserting that the charge is unreasonable or irrational. While not conclusive, I note that Mississippi's transcript charge falls comfortably within the range of charges throughout the Nation. See, e. g., Ariz. Rev. Stat. Ann. § 12-224(B) (1992) ($2.50/page); Idaho Code § 1-1105(2) (1990) ($2/page); Mass. Gen. Laws § 221:88 (1994) ($3/page); Mo. Rev. Stat. § 485.100 (1994) ($1.50/page); N. M. Stat. Ann. § 34-6-20(C) (1996) ($1.65/page); R. I. Gen. Laws § 8-5-5 (Supp. 1995) (family court transcripts, $3/page); S. C. App. Ct. Rule 508 ($2/page).
[3] In Little v. Streater, 452 U. S. 1 (1981), we held that the Due Process Clause required the States to provide a free blood grouping test to an indigent defendant in a paternity action. The Court observed that "[a]part from the putative father's pecuniary interest in avoiding a substantial support obligation and liberty interest threatened by the possible sanctions for noncompliance, at issue is the creation of a parent-child relationship. This Court frequently has stressed the importance of familial bonds, whether or not legitimized by marriage, and accorded them constitutional protection. Just as the termination of such bonds demands procedural fairness, so too does their imposition." Id., at 13 (citations omitted). Little `s description of the interest at stake in a paternity suit seems to place it on par with the interest here.

Justice Blackmun, dissenting in Lassiter v. Department of Social Servs. of Durham Cty., 452 U. S. 18, 58 (1981), recognized as much: "I deem it not a little ironic that the Court on this very day grants, on due process grounds, an indigent putative father's claim for state-paid blood grouping tests in the interest of according him a meaningful opportunity to disprove his paternity, Little v. Streater, [supra,] but in the present case rejects, on due process grounds, an indigent mother's claim for state-paid legal assistance when the State seeks to take her own child away from her in a termination proceeding." (Emphasis deleted.)
As the majority indicates, ante, at 118, n. 11, we have distinguished in my view unpersuasivelybetween the requirements of due process in paternity suits and in termination suits. See Rivera v. Minnich, 483 U. S. 574 (1987). Whether we will distinguish between paternity appellants and misdemeanor appellants remains to be seen.
[4] See, e. g., Zakrzewski v. Fox, 87 F. 3d 1011, 1013-1014 (CA8 1996) (father's "fundamental" "liberty interest in the care, custody and management of his son has been substantially reduced by the terms of the divorce decree and Nebraska law").
[5] In Boddie v. Connecticut, 401 U. S. 371 (1971), we referred to a divorce as the "adjustment of a fundamental human relationship." Id., at 382-383.
[6] See, e. g., Moore v. East Cleveland, 431 U. S. 494 (1977).
[7] Cf. Lindsey v. Normet, 405 U. S. 56, 89-90 (1972) (Douglas, J., dissenting in part) ("[W]here the right is so fundamental as the tenant's claim to his home, the requirements of due process should be more embracing").
[8] Accordingly, Mississippi will no doubt find little solace in the fact that, as the majority notes, of 63,765 civil actions filed in Mississippi Chancery Court in 1995, 194 were parental termination cases. Ante, at 122. Mississippi pointed out in its brief that of these civil actions, "39,475 were domestic relations cases," "1027 involved custody or visitation, and 6080 were paternity cases." Brief for Respondents 28.