# NO. 12-12-00119-CV

# IN THE COURT OF APPEALS

# TWELFTH COURT OF APPEALS DISTRICT

# TYLER, TEXAS

| | | |
|---|---|---|
| *IN THE INTEREST OF* | § | *APPEAL FROM THE 173RD* |
| *S.S., K.S., AND R.W., JR.,* | § | *JUDICIAL DISTRICT COURT* |
| *CHILDREN* | § | *HENDERSON COUNTY, TEXAS* |

## *OPINION*

S.S. and S.S.1,[1] K.S., and R.W., Jr. (the children) appeal the termination of S.S.'s parental rights. On appeal, S.S. presents three issues, and the children present four issues. We affirm.

## BACKGROUND

S.S. is the mother of three children, S.S.1, born October 10, 2006, K.S., born January 1, 2008, and R.W., Jr., born February 7, 2009. L.W. is the father of S.S.1, M.C.M. is the father of K.S., and R.L.W. is the father of R.W., Jr.[2] None of the fathers are a party to this appeal. On June 18, 2009, the Department of Family and Protective Services (the Department) filed an original petition for protection of the children, for conservatorship, and for termination of S.S.'s parental rights. The Department was appointed the children's temporary managing conservator, and S.S. was appointed their temporary possessory conservator.

After a jury trial, the jury found, by clear and convincing evidence, that S.S. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights,

---

[1] The initials of the mother and her oldest child are the same. Therefore, we will refer to the mother as S.S. and to her oldest child as S.S.1.

[2] According to testimony at trial, the parent-child relationships between S.S.1 and L.W. and between K.S. and M.C.M. were terminated before trial. On January 13, 2012, the jury found, by clear and convincing evidence, that R.L.W. had engaged in one or more of the acts or omissions necessary to support termination of his parental rights, and that termination of the parent-child relationship was in the best interest of the child. Accordingly, on March 8, 2012, the trial court ordered the termination of R.L.W.'s parent-child relationship with R.W., Jr.

and that termination of the parent-child relationship between S.S. and the children was in the children's best interest. Further, the jury found that the Department should be appointed managing conservator of the children. Based on these findings, the trial court ordered that the parent-child relationship between S.S. and the children be terminated. Moreover, the trial court ordered that the Department be appointed permanent managing conservator of the children. S.S. filed a motion for new trial, which was denied. This appeal followed.

## ADMISSION OF EVIDENCE

In the children's first and second issues, they argue that the trial court erred by improperly admitting hearsay evidence, business records affidavits, and scientific, technical, and specialized knowledge without expert testimony concerning drug test results in violation of the Texas Rules of Evidence. Further, the children contend that the resulting harm from improperly admitting this testimony and evidence was substantial and probably caused the rendition of an improper judgment.

## Standard of Review

We review a trial court's evidentiary rulings for abuse of discretion. *Owens–Corning Fiberglas Corp. v. Malone*, 972 S.W.2d 35, 43 (Tex. 1998). A trial court abuses its discretion if it acts without reference to any guiding rules or principles or if its actions are arbitrary and unreasonable. *Downer v. Aquamarine Operators, Inc.*, 701 S.W.2d 238, 241-42 (Tex. 1985). We must uphold the trial court's evidentiary ruling if there is any legitimate basis for the ruling. *Owens-Corning Fiberglas Corp.*, 972 S.W.2d at 43.

## Applicable Law

"Hearsay" is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted. TEX. R. EVID. 801(d). The proponent of hearsay has the burden of showing that the testimony fits within an exception to the general rule prohibiting the admission of hearsay evidence. *Volkswagen of Am., Inc. v. Ramirez*, 159 S.W.3d 897, 908 n.5 (Tex. 2004). However, the following exception applies for business records:

> A . . . record . . . made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, or by

2

affidavit that complies with Rule 902(10), unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness.

TEX. R. EVID. 803(6); *Simien v. Unifund CCR Partners*, 321 S.W.3d 235, 240 (Tex. App.—Houston [1st Dist.] 2010, no pet.). The predicate for admission of the business records may be established "by [an] affidavit that complies with Rule 902(10)." TEX. R. EVID. 803(6).

Rule 902(10) provides that business records "shall be admissible in evidence in any court in this state upon the affidavit of the person who would otherwise provide the prerequisites of Rule 803(6)." TEX. R. EVID. 902(10)(a). The predicate witness does not have to be the record's creator or have personal knowledge of the contents of the record. *Brooks v. State*, 901 S.W.2d 742, 746 (Tex. App.—Fort Worth 1995, pet. ref'd). The witness need only have personal knowledge of the manner in which the records were prepared. *Id*. Rule 902(10) also provides a form for the affidavit and states that the affidavit "shall be sufficient if it follows this form though this form shall not be exclusive, and an affidavit which substantially complies with the provisions of this rule shall suffice . . . ." TEX. R. EVID. 902(10)(b).

## Objections and Testimony

On the first day of trial, but before voir dire, the children's counsel objected to the admission of the results of hair follicle drug testing through the introduction of business records, asserting that the Department had not designated any experts who could satisfy the standards set forth in Texas Rule of Evidence 702. Further, counsel objected that the Department intended to rely upon these business records to show, by clear and convincing evidence, that S.S. and R.L.W. engaged in one or more of the acts or omissions necessary to support termination of their parental rights, more specifically, the conduct described in subsections 161.001(1)(D) and (E) of the Texas Family Code.[3] S.S.'s counsel joined in the children's objections. The trial court overruled the objections "to the extent of the results themselves of drug tests contained in business records." Before trial, and before the testimony began, counsel for the children and for S.S. renewed their objections. They also requested a running objection regarding both business

---

[3] A court may order termination of the parent-child relationship if the court finds by clear and convincing evidence that the parent has knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well being of the child or engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well being of the child. *See* TEX. FAM. CODE ANN. § 161.001(1)(D), (E) (West Supp. 2012).

records affidavits. The trial court denied their objections, but granted them a running objection to the affidavits.

At trial, Angie Hope, a collector with Drug Test Services of East Texas, testified that she collects urine, hair, and nail specimens for drug testing. She stated that she collected hair samples from the children on three separate occasions, from S.S. on approximately ten occasions, and from R.L.W. on two occasions. Hope testified that when she collects a hair sample for drug testing, she collects approximately 120 strands of hair from an individual, folds the hair in an envelope, seals the envelope, completes a "chain-of-custody" form, and ships the sample by FedEx to a laboratory in Ohio. However, she stated that she did not have any personal knowledge about what happens to a hair sample after she ships it to Ohio.

On the third day of trial, counsel for the children and for S.S. objected again, citing *In re K.C.P.*[4] for the proposition that the business records regarding the drug test results should not be admitted. The trial court overruled their objections. Paige Jones, a caseworker with the Department, testified that she was a conservatorship caseworker in 2009 when she was assigned to the children. During her testimony, the Department offered into evidence Exhibits 8 and 9, i.e., two affidavits of business records from the Texas Alcohol and Drug Testing Service. Counsel for the children and for S.S. renewed their previous objections, and stated that Jones was not the proper witness to authenticate or lay the foundation for these exhibits. The trial court noted their previous objections, overruled them, and admitted the exhibits. On cross examination, Jones testified that she received the drug test results from the Texas Alcohol and Drug Testing Service, that she did not have any familiarity with the methodology for testing, that she could not state that the testing is reliable, and that she had no personal knowledge that testing was done in accordance with industry standards.

Exhibits 8 and 9 are business records affidavits from the Texas Alcohol and Drug Testing Service. The affidavits are signed by Vicki S. Phelps, the custodian of records, and are substantially the same as the form provided in Texas Rule of Evidence 902(10)(b). Exhibit 8 included reports of the results of thirteen hair follicle drug tests and Exhibit 9 included a report of the result of one hair follicle drug test. Each exhibit included a drug testing custody and control form for each report. The following are the results of the drug tests:

---

[4] 142 S.W.3d 574, 579 (Tex. App.—Texarkana 2004, no pet.).

- June 17, 2009—S.S.1 and R.W., Jr. tested positive for cocaine, but S.S. and K.S. tested negative.

- June 26, 2009—R.L.W. tested positive for cocaine.

- October 12, 2010—K.S. and R.L.W. tested positive for cocaine and S.S. tested positive for marijuana.

- July 13, 2011—S.S. and K.S. tested positive for marijuana, R.W., Jr. tested positive for cocaine, and S.S.1 tested negative.

- S. S. tested positive for marijuana on two other occasions (December 9, 2009 and April 8, 2010).

## <u>Analysis</u>

The records complained of clearly are business records from the Texas Alcohol and Drug Testing Service. The children contend, however, that the critical question is whether the statements, i.e., the drug test results, showed sufficient indicia of trustworthiness or reliability to bring them within an exception to the hearsay rule. *See In re K.C.P.*, 142 S.W.3d 574, 579 (Tex. App.—Texarkana 2004, no pet.); *see also* TEX. R. EVID. 803(6) (business records not admissible under Rule 803(6) if "the source of information or the method or circumstances of preparation indicate lack of trustworthiness"). As pointed out in *In re K.C.P.*, some civil cases have found business records containing laboratory test results admissible by showing where the specimen was drawn, that it was sent to a laboratory, and that a medical doctor analyzed it and reported the results. *See id.* (citing *March v. Victoria Lloyds Ins. Co.*, 773 S.W.2d 785, 788 (Tex. App.—Fort Worth 1989, writ denied)). However, criminal cases require more. *See id.*

In *Philpot v. State*, the court held that drug test results were inadmissible even though the sponsoring witness provided all the predicate testimony for business records. *See Philpot*, 897 S.W.2d 848, 852 (Tex. App.—Dallas 1995, pet. ref'd). More specifically, the court stated there was no evidence that (1) the tests conducted were standard tests for the controlled substance, (2) the entries were made by a person who had personal knowledge of the test and the test results, or that (3) the test results were records kept in the usual course of business of the laboratory. *See id.*; *see also Strickland v. State*, 784 S.W.2d 549, 553 (Tex. App.—Texarkana 1990, pet. ref'd) (holding that test results were admissible as business records when witness could testify that tests were standard tests for particular substance, made by person who had personal knowledge of test and test results, and results were recorded in records kept in the usual course of business of laboratory). Because of the more stringent clear and convincing standard for a parental

termination case as opposed to other civil cases, the Texarkana court has held that it is inappropriate to apply the more relaxed civil standard in determining the admissibility of business records. *See In re K.C.P.*, 142 S.W.3d at 580. We agree with the Texarkana court's reasoning and apply it here.

In this case, there is no evidence to show that the sponsoring witness had personal knowledge of how the tests were conducted. *See id*. There is no evidence regarding the qualifications of the persons who tested the samples, the types of tests administered, or whether such tests were standard for the particular substance. *See id*. Also, there is no evidence about the types of devices used to conduct the tests or the methods used by the independent laboratory that conducted the tests. *See id*. Further, there is no evidence to show that the devices used to conduct the tests were properly supervised, maintained, or operated by a person who was competent to do so. *See id*. And finally, there was no effort at trial to provide this information to the court through any other method. *See id*.

Absent evidence of the qualifications of the person who tested the specimens, the equipment used, the method of administering the test, and whether the test was a standard one for the particular substance, there is insufficient indicia of trustworthiness or reliability to bring the test results in the instant case within the business records exception to the hearsay rule. *See id*.; *Philpot*, 897 S.W.2d at 852; *see also* TEX. R. EVID. 803(6). Thus, the trial court abused its discretion in admitting Exhibits 8 and 9.

## Reversible Error

To obtain reversal of a judgment based on a trial court's error in admitting or excluding evidence, the complaining party must show that (1) the trial court committed an error, and (2) the error was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *State v. Cent. Expressway Sign Assoc.*, 302 S.W.3d 866, 870 (Tex. 2009); *Gee v. Liberty Mut. Fire Ins. Co.*, 765 S.W.2d 394, 396 (Tex. 1989); *see also* TEX. R. APP. P. 44.1(a)(1). In making this determination, the court must review the entire record. *Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. The exclusion is likely harmless if the evidence was cumulative, or the rest of the evidence was so one-sided that the error likely made no difference in the judgment. *Id*. A successful challenge to a trial court's evidentiary rulings requires the complaining party to demonstrate that the judgment turns on the particular evidence excluded or admitted. *Interstate Northborough P'ship v. State*, 66 S.W.3d 213, 220 (Tex.

2001). Therefore, we must determine whether termination of S.S.'s parental rights turned on the admission of Exhibits 8 and 9.

*First Set of Test Results*

The first set of results related to drug tests conducted on June 17 and 26, 2009. The Department argues that any error in admitting the June 17 and 26, 2009 drug test results was harmless because the same or similar evidence was subsequently introduced without objection. *Ramirez*, 159 S.W.3d at 907. More specifically, the Department points out that at least two witnesses testified about drug use. Additionally, the trial court admitted S.S.'s original Family Plan of Service as Exhibit 10, S.S.'s Evaluated Family Plan of Service as Exhibit 11, and R.L.W.'s original Family Plan of Service as Exhibit 12. Jones was the sponsoring witness for these exhibits, which were admitted without any objection from the children.

Kristina McGee, an investigator with the Department, testified that the children were removed from S.S.'s home on June 17, 2009. She stated that they were removed because of inconsistent stories about an injury to K.S.'s leg in addition to the possibility of drugs being used in the home. According to McGee, the drug tests were positive for cocaine, but she did not state whose tests were positive. McGee stated that S.S. never tested positive for cocaine, but that if drugs were found in the children's systems, that would constitute physical harm to the children.

Paige Jones, a caseworker at the Department, was the sponsoring witness for Exhibits 8 and 9. She testified that the Department initially removed the children because of a handprint on K.S.'s leg, and because two of the children and R.L.W., the father of the youngest child, tested positive for drugs. Jones stated that the Department was very concerned about the children being exposed to drugs, how they were exposed to drugs, and that R.L.W. was in the home. She stated again that drug use was the main concern of the Department. Jones also testified that she was concerned about R.L.W. because he tested positive for cocaine. She admitted saying, at one point, that she did not mind R.L.W. and S.S. being together, but that drug use was the Department's "issue" with them. S.S. testified that she did not have any explanation as to why her children tested positive for cocaine when they were first removed from her. She stated that she has never tested positive for cocaine, and did not know how her children were exposed to it.

In Exhibits 10 and 11, the Department stated that its initial concerns on July 15, 2009, were that S.S. "had been living with a man who tested highly positive for cocaine. [S.S.]'s children, [S.S.1 and R.W., Jr.] also tested positive for cocaine." Exhibit 12 included a statement

7

that the Department's initial concerns about R.L.W. on July 20, 2009, were that he "tested positive for cocaine" and that R.W., Jr. "also tested positive for cocaine." Moreover, according to Jones, R.L.W. admitted that his "drug of choice" was cocaine and marijuana. The children did not object. Because evidence that S.S.1, R.W., Jr., and R.L.W. tested positive for cocaine was admitted without objection, we agree that admission of the first set of positive drug test results obtained on June 17 and 26, 2009, was harmless. *See id*.

*Second and Third Sets of Test Results*

The jury found that S.S. engaged in three acts or omissions necessary to support termination of her parental rights pursuant to subsection 161.001(1) of the Texas Family Code, and that termination of her parental rights was in the children's best interest. The Department argues, in part, that even if the second and third sets of test results were erroneously admitted, the termination of S.S.'s parental rights does not turn on this evidence. *See Cent. Expressway Sign Assocs.*, 302 S.W.3d at 870. More specifically, the Department points out that S.S. failed to comply with her service plan, and that termination can be affirmed on this ground even without consideration of these test results. We agree.

On July 6, 2009, the trial court signed an order establishing that for S.S. to have the children returned to her, she must comply with each requirement of the Department's original, or any amended, service plan. *See* TEX. FAM. CODE ANN. § 161.001(1)(O) (West Supp. 2012). As we explain later in this opinion, we have examined the evidence properly admitted at trial and have concluded that this evidence is both legally and factually sufficient to support a finding that S.S. failed to comply with certain requirements of the Department's service plan in accordance with the trial court's July 6, 2009 order. We have also concluded from the same evidence that termination is in the best interest of the children. Consequently, we are unable to conclude from the record that termination of S.S.'s parental rights turned on the admission of the second and third sets of positive drug test results. *See Interstate Northborough P'ship*, 66 S.W.3d at 220; *Cent. Expressway Sign Assoc.*, 302 S.W.3d at 870. Therefore, we cannot conclude that the error in admitting the second and third set of positive drug test results was reasonably calculated to cause, and probably did cause, rendition of an improper judgment. *See Cent. Expressway Sign Assoc.*, 302 S.W.3d at 870; *Gee*, 765 S.W.2d at 396. Accordingly, we overrule the children's first and second issues.

8

## TERMINATION OF PARENTAL RIGHTS

Involuntary termination of parental rights embodies fundamental constitutional rights. *Vela v. Marywood*, 17 S.W.3d 750, 759 (Tex. App.–Austin 2000), *pet. denied per curiam*, 53 S.W.3d 684 (Tex. 2001); *In re J.J.*, 911 S.W.2d 437, 439 (Tex. App.–Texarkana 1995, writ denied). Because a termination action permanently sunders the bonds between a parent and child, the proceedings must be strictly scrutinized. *Wiley v. Spratlan*, 543 S.W.2d 349, 352 (Tex. 1976); *In re Shaw*, 966 S.W.2d 174, 179 (Tex. App.–El Paso 1998, no pet.).

Section 161.001 of the family code permits a court to order termination of parental rights if two elements are established. TEX. FAM. CODE ANN. § 161.001 (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d 234, 237 (Tex. App.–Waco 1999, no pet.). First, the parent must have engaged in any one of the acts or omissions itemized in the first subsection of the statute. TEX. FAM. CODE ANN. § 161.001(1) (West Supp. 2012); *Green v. Texas Dep't of Protective & Regulatory Servs.*, 25 S.W.3d 213, 219 (Tex. App.–El Paso 2000, no pet.); *In re J.M.T.*, 39 S.W.3d at 237. Second, termination must be in the best interest of the child. TEX. FAM. CODE ANN. § 161.001(2) (West Supp. 2012); *In re J.M.T.*, 39 S.W.3d at 237. Both elements must be established by clear and convincing evidence, and proof of one element does not alleviate the petitioner's burden of proving the other. TEX. FAM. CODE ANN. § 161.001; *Wiley*, 543 S.W.2d at 351; *In re J.M.T.*, 39 S.W.3d at 237.

The clear and convincing standard for termination of parental rights is both constitutionally and statutorily mandated. TEX. FAM. CODE ANN. § 161.001; *In re J.J.*, 911 S.W.2d at 439. Clear and convincing evidence means the measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established. TEX. FAM. CODE ANN. § 101.007 (West 2008). The burden of proof is upon the person seeking to deprive the parent of their parental rights. *In re J.M.T.*, 39 S.W.3d at 240.

## STANDARD OF REVIEW

When confronted by both a legal and factual sufficiency challenge, an appellate court must first review the legal sufficiency of the evidence. *Glover v. Tex. Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex. 1981); *In re M.D.S.*, 1 S.W.3d 190, 197 (Tex. App.–Amarillo 1999, no pet.). In conducting a legal sufficiency review, we must look at all the evidence in the light most

favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its findings were true. *In re J.F.C.*, 96 S.W.3d 256, 264 (Tex. 2002). We must assume that the fact finder settled disputed facts in favor of its finding if a reasonable fact finder could do so and disregard all evidence that a reasonable fact finder could have disbelieved or found incredible. *Id*.

The appropriate standard for reviewing a factual sufficiency challenge to the termination findings is whether the evidence is such that a fact finder could reasonably form a firm belief or conviction about the truth of the petitioner's allegations. *In re C.H.*, 89 S.W.3d 17, 25 (Tex. 2002). In determining whether the fact finder has met this standard, an appellate court considers all the evidence in the record, both that in support of and contrary to the trial court's findings. *Id*. at 27-29. Further, an appellate court should consider whether disputed evidence is such that a reasonable fact finder could not have reconciled that disputed evidence in favor of its finding. *In re J.F.C.*, 96 S.W.3d at 266. The trier of fact is the exclusive judge of the credibility of the witnesses and the weight to be given their testimony. *Nordstrom v. Nordstrom*, 965 S.W.2d 575, 580 (Tex. App.–Houston [1st Dist.] 1997, pet. denied).

## TERMINATION UNDER SECTION 161.001(1)(O)

In a portion of her first issue, S.S. argues that the evidence is legally and factually insufficient to support the jury's finding that she failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of her children.

## Applicable Law

The court may order termination of the parent-child relationship if it finds by clear and convincing evidence that the parent has failed to comply with the provisions of a court order that specifically established the actions necessary for the parent to obtain the return of the child who has been in the permanent or temporary managing conservatorship of the Department for not less than nine months as a result of the child's removal from the parent for the abuse or neglect of the child. TEX. FAM. CODE ANN. §161.001(1)(O) (West Supp. 2012). Substantial compliance is not enough to avoid a termination finding under subsection 161.001(1)(O). *In re C.M.C.*, 273 S.W.3d 862, 875 (Tex. App.—Houston [14th Dist.] 2008, no pet.). In other words, this provision does not quantify any particular number of provisions of the service plan that a parent must not

10

achieve in order for parental rights to be terminated or the degree of a parent's conduct that will be deemed to be a failure to achieve a particular requirement of the service plan. *In re J.S.*, 291 S.W.3d 60, 67 (Tex. App.—Eastland 2009, no pet.). Lastly, subsection 161.001(1)(O) does not "make a provision for excuses" for the parent's failure to comply with the service plan. *Id*. (quoting *In re T.N.F.*, 205 S.W.3d 625, 631 (Tex. App.—Waco 2006, pet. denied)).

It is undisputed that at the time of trial, which began on January 9, 2012, the Department had been temporary managing conservator of the children since July 6, 2009. According to McGee, the children were removed because of inconsistent stories about an injury to K.S.'s leg in addition to the possibility of drugs being used in the home. Jones also believed that the children were removed for abuse or neglect, explaining that she believes exposing children to drugs is physical abuse. This evidence establishes that the children were removed as a result of S.S.'s abuse or neglect.

**The Service Plans**

There were two service plans entered into evidence at trial, but only one was signed by S.S. Each of the two service plans required S.S. to take certain actions. However, S.S. argues that the record did not contain a written order requiring her to comply with the service plan that specifically established the actions necessary for her to obtain the return of her children. The temporary order dated July 6, 2009, and entered into evidence at trial, stated as follows:

> The Court finds and hereby notifies the parents that each of the actions required of them below are necessary to obtain the return of the children, and failure to fully comply with these orders [ ] may result in the restriction or termination of parental rights.

Below this notice was a subsection entitled "Compliance with Service Plan" that ordered S.S. "pursuant to § 263.106, Tex. Fam. Code, to comply with each requirement set out in the Department's original, or any amended, service plan during the pendency of this suit." Thus, the temporary order specifically established the actions necessary for S.S. to obtain the return of the children and required S.S. to comply with the Department's original, or any amended, service plan during the pendency of the suit.

Moreover, the permanency hearing orders dated July 13, 2010, and March 3, 2011, directed that the children be placed with S.S. in a monitored return. Both orders stated that S.S.

11

demonstrated adequate and appropriate compliance with the service plan.[5] But each order also provided that, except as specifically modified, the permanency plans and recommendations for the children set out in the service plans and/or permanency progress reports filed with the court were incorporated into the order and approved. Further, the court ordered that all previous orders not in conflict with the order continue without modification. Thus, the temporary orders and the service plans, except as modified, were incorporated into the permanency hearing orders, approved, and continued without modification.

The Department characterizes the monitored return plan admitted into evidence as an amended service plan. The plan included requirements to be followed by S.S. in order to prevent further legal action or removal of her children. The plan was signed by S.S., but was not filed with the court. Moreover, there is no language within the permanency hearing order that specifically required S.S. to comply with the monitored return plan. Instead, the permanency hearing orders directed the Department to monitor the placement of the children and to remove the children from S.S.'s home if circumstances indicated that the home was no longer a safe environment. Because the permanency hearing orders did not require S.S. to comply with the provisions of the monitored return plan and the plan was not filed with the court, the monitored return plan is not an order contemplated by subsection 161.001(1)(O) of the Texas Family Code.

**The Evidence**

The first service plan, signed by S.S. on August 7, 2009, states that "S.S. understands the Department will not be able to recommend reunification of her children in her home as long as she is residing with R.L.W. should he continue to test positive during this case." The second service plan required S.S. to be "honest with the Department regarding her relationship with R.L.W." Further, both service plans prohibited S.S. from "associat[ing] with known criminals or persons using illegal drugs."

The evidence shows that Jones explained to S.S. that her children would not be returned to her if she was residing with R.L.W. and he continued to test positive for drugs. Although S.S. indicated that she would do whatever it took to get her children back, Jones was concerned. She expressed her concern to S.S. about her being around persons who used illegal substances, i.e., R.L.W., approximately "twenty-eight" times.

---

[5] Paige Jones, a caseworker with the Department, testified that the Department did not agree with the court's decision to place the children with S.S. in the first monitored return in 2010.

12

Jones testified that in September 2009, S.S. had a "revelation" and admitted that her children might have tested positive through R.L.W. She testified that in September 2009, S.S. told her that she "would get rid of" R.L.W. in order to get her children back. At that time, S.S. informed Jones that she and R.L.W. had broken up approximately two weeks before. When Jones attempted an unannounced home visit on September 28, 2009, she saw R.L.W. walking into the home. Jones did not stop. She went back to S.S.'s home the next morning and saw R.L.W. leaving. Again, Jones did not stop. She talked to S.S. that afternoon when she went back to S.S.'s home. According to Jones, S.S. stated that R.L.W. and a friend came over to bring her a new mattress, but did not explain how that took two days.

Jones stated that in November 2009, she discovered S.S. had moved to another apartment. When Jones attempted to locate S.S., she mistakenly knocked on the wrong door. However, she noticed R.L.W. walking into a different apartment, although she admitted not recognizing him at that time. She testified that when she found S.S.'s apartment, it was the same apartment that she had seen R.L.W. enter. Jones stated that S.S. answered the door and told Jones that R.L.W. was in the bedroom. She testified that during this visit, R.L.W. stated his drugs of choice were cocaine and marijuana. R.L.W. also told Jones that he would be positive for marijuana if he was tested, but had not used cocaine "in a while." To Jones's knowledge, R.L.W. came to see the children four or five times while they were in S.S.'s care during her first monitored return.

Jones noted that at a hearing in January 2011, S.S. stated she had not seen R.L.W. since October 2010. Kiffany Gatson, a caseworker with the Department, testified that at a hearing in May 2011, S.S. was asked if she was pregnant. According to Gatson, S.S. stated that she was not and appeared "offended" at the question. Gatson testified that in July 2011, S.S. admitted that she was approximately five months pregnant, that R.L.W. was the father, and that she had last seen him on December 31, 2010. At one point, Gatson took the children and S.S. home and recalled that upon entering the home, R.W., Jr. ran to the back of the house yelling, "Daddy." Moreover, Gatson testified that the children told her R.L.W. was in the house.

S.S. stated that she knew she needed to stay away from R.L.W. However, she admitted that she had just had his child, occasionally left her three month old baby with him, and thus, had not stayed away from him. At times during both monitored returns, she admitted that R.L.W.

13

would "show up."  She stated that when she walked the children to day care, R.L.W. would walk with her.

S.S. was also required to maintain weekly contact with her caseworker.  She was required to notify the caseworker immediately of any changes in her living situation and employment, and within seventy-two hours of any change in her address and telephone number.  Jones stated that she spoke to S.S. approximately twice a week or eight to ten times a month as required by the service plan.  However, S.S. did not inform Jones when she moved from Athens to Malakoff.  Gatson stated that S.S. did not inform her for two months that she had moved during her second monitored return.

Other requirements related to S.S.'s ability to provide for and care for her children.  One requirement was that she maintain housing for at least six months that was free of health and safety hazards, and equipped with all working utilities.  Another was that she obtain and maintain legal employment for a period of six months.  The evidence shows that for the majority of the time, S.S. had her own home. Jones testified that in May 2010, S.S. said that her electricity had been turned off because of trouble with her deposit.  This incident occurred after the first monitored return of S.S.'s children.  Jones allowed S.S. and the children to live with S.S.'s grandmother until the electricity was turned on again.  She testified that she was concerned about the stairs at S.S.'s apartment complex, describing them as very steep and constructed of concrete and metal.  She stated that the stairs were dangerous and ordered a baby gate to prevent the children from running down the steps.

According to Jones, S.S. had seasonal employment once for a few months.  There was no evidence that S.S. maintained employment for a period of six months.  S.S. was able to provide for her children primarily through assistance from disability benefits, food stamps, government housing, and child support from K.S.'s father.

And finally, some of the requirements pertained to psychological counseling for S.S.  She was required to participate in a psychological evaluation through Dr. Robert Sperry and follow his recommendations. One recommendation was that S.S. establish a safe, nonviolent, drug free, and permanent home for her children.  S.S. was also required to attend counseling with Julianne Davis until she obtained a written release from therapy.  Jones agreed that S.S. completed the psychological evaluation.  However, the evidence shows that S.S. did not maintain and establish a nonviolent, drug free home for her children.  As previously noted, Jones discovered in

14

November 2009 that R.L.W. was in S.S.'s home, that he admitted that his drugs of choice were cocaine and marijuana, and that he would be positive for marijuana if he were tested. Jones also testified that at a hearing in October 2010, S.S. stated that she had been abused by R.L.W. off and on for three years. According to Jones, S.S. admitted that after one of the hearings, R.L.W. beat her up and "busted" her teeth.

Further, Gatson stated that in July 2011, S.S. admitted that she was approximately five months pregnant, that R.L.W. was the father, and that she had last seen him on December 31, 2011. S.S. testified that she did not allow R.L.W. to live in her home, but that he was still around her. She stated that she had been abused by R.L.W., and that it started about a year after she and R.L.W. were together, or approximately two years ago. S.S. testified that even though R.L.W. is abusive, he has never abused the children and they have never witnessed his abuse.

Jones testified that S.S. attended counseling in "spurts." Julianne Davis, a licensed professional counselor, testified that she counseled S.S from September 2009 through August 2010. However, she stated that S.S.'s attendance was inconsistent, with numerous late cancellations and "no shows." Over a period of a year, Davis saw S.S. for only nine counseling sessions and believed that she did not have enough time to enable S.S. to make lifelong changes.

## Conclusion

Viewing the above evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that S.S. failed to comply with the Department's service plan. From this evidence, a reasonable trier of fact could have formed a firm belief or conviction that S.S. failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.

Although there is disputed evidence about whether S.S. and R.L.W. lived together and whether the children witnessed R.L.W.'s abuse of S.S. or his drug use, this evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that S.S. failed to comply with the provisions of a court order that specifically established the actions necessary for her to obtain the return of the children.

15

We hold that the evidence is legally and factually sufficient to support termination of S.S.'s parental rights under Section 161.001(1)(O). Accordingly, that portion of S.S.'s first issue regarding subsection 161.001(1)(O) is overruled.[6]

## BEST INTEREST OF THE CHILD

S.S. also argues in her first issue that the evidence is legally and factually insufficient to support the jury's finding that termination of the parent-child relationship was in the children's best interest.

In determining the best interest of the child, a number of factors have been considered, including (1) the desires of the child; (2) the emotional and physical needs of the child now and in the future; (3) the emotional and physical danger to the child now and in the future; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals; (6) the plans for the child by these individuals; (7) the stability of the home; (8) the acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one; and (9) any excuse for the acts or omissions of the parent. *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).

This list is not exhaustive, but simply indicates considerations that have been or could be pertinent. *Id*. However, the best interest of the child does not require proof of any unique set of factors nor limit proof to any specific factors. *In re D.M.*, 58 S.W.3d 801, 814 (Tex. App.—Fort Worth2001, no pet.). The *Holley* test focuses on the best interest of the child, not the parent's best interest. *Dupree v. Texas Dep't of Protective & Regulatory Servs.*, 907 S.W.2d 81, 86 (Tex. App.—Dallas 1995, no writ). We apply the *Holley* factors below, but do not consider the second and third sets of drug test results.

*The desires of the children*

Jones admitted that the children are very attached to S.S. and when they are removed from her care, it is very hard on them. Further, she stated that the children ask for their mother "a lot." Gatson stated that there is "no question" that the children want to be with their family

---

[6] Under Section 161.001, the Department was required to prove only one ground of termination under subsection (1). Because we have concluded that the evidence is legally and factually sufficient to support termination of S.S.'s parental rights under subsection (1)(O), we need not determine if the trial court's findings under subsections (1)(D) and (1)(E) are also supported by legally and factually sufficient evidence. Therefore, we do not address S.S.'s first issue regarding these grounds for termination.

and are bonded with their mother. Marita Giles, a court appointed special advocate volunteer, stated that the children are attached to S.S. and "devastated" when they are removed. S.S. testified that her children want to come home to be with her.

*The emotional and physical needs of the children now and in the future*

Jones admitted that the children had not done well in foster care. She stated that in November 2009, K.S. suffered a significant head injury in foster care, and the children were removed and placed in another foster home. She testified that at another foster home, K.S. got a bead or marble stuck in her ear. K.S.'s ear became infected requiring surgery. Jones also testified that K.S. suffered a candle burn on her hand while in foster care. She admitted that the children have been in eight foster care placements during the pendency of the case. Brandi Harris, a conservatorship supervisor for the Department, stated that the two older children are in one foster home and the younger child is in a different foster home. However, she stated that the foster homes are close and the children have regular contact with each other. She also stated that the children have been removed from three foster homes for abuse or neglect.

*The emotional and physical danger to the children now and in the future*

The first set of drug test results shows that two of the children and R.L.W. tested positive for cocaine. S.S. admitted using marijuana, and R.L.W. admitted that his drugs of choice were cocaine and marijuana. Jones stated that S.S. admitted that her children might have tested positive through R.L.W. S.S. also admitted that R.L.W. abused her, although she denied that the children were abused by him or witnessed his abuse of her. However, she also admitted that she had just had his child, occasionally left her three month old baby with him, and thus, had not stayed away from him. Jones stated that to her knowledge, R.L.W. came to see the children four or five times while they were in S.S.'s care during her first monitored return. Gatson testified that the children told her that R.L.W. was in the house.

*The parental abilities of the parent seeking custody*

The evidence showed that S.S. was unable to provide a safe, drug free, nonviolent, and permanent home for the children. S.S. admitted using marijuana, and the first set of drug test results shows that two of her children and R.L.W. tested positive for cocaine. S.S. also failed to stay away from R.L.W., an admitted and proven drug user. S.S. also stated that R.L.W. abused her, although she denied that the children witnessed his abuse. Kristina McGee, an investigator with the Department, testified that the children were removed because of inconsistent stories

about an injury to K.S.'s leg, in addition to the possibility of drugs being used in the home. Jones stated that S.S. was tearful, frequently frustrated, and could not understand why her children were removed.

Robert Sperry, Ph.D., a psychologist, examined and evaluated S.S. in April 2009. He testified that S.S.'s personality assessment inventory revealed marked elevations for a history of intense and volatile interpersonal relationships, preoccupation with fears of abandonment or rejection, elevated and variable moods, and inflated self-esteem, expansiveness, and grandiosity. Sperry stated that S.S.'s assessment also showed that she had experienced traumatic stress, had an elevated history of antisocial behaviors, and appeared to be hypervigilant and mistrustful. He also testified that S.S. was below levels expected for her age on a test of functions for working memory, i.e., being able to organize, delay frustration, concentrate, and plan.

Julianne Davis, a licensed professional counselor, testified that she counseled S.S. beginning September 2009. She believed that S.S.'s emotional stress overrode her ability to make good decisions for herself and her family. Davis stated that S.S. is a "cryer," and becomes very tearful, anxious, worried, and scared. She stated that S.S.'s insight was fairly poor and her problem solving abilities were on the low end. Davis also testified that she was concerned when S.S. shared her drug use because she believed it was S.S.'s attempt to self-medicate in order to deal with her anxiety and stress.

Brandi Harris testified that each factor that the Department uses to assess whether or not children are at risk of dying in the home is present in this case: children under the age of three, domestic violence between the parents, Department history, criminal history, parental immaturity, lack of concern for the children, chaotic home environment, and drug use by caregivers or others in the home.

*The programs available to assist the parent*

Jones stated that Davis referred S.S. to the Andrews Center for counseling. However, Jones did not believe S.S. was going to the Andrews Center. According to Jones, the Andrews Center informed her that they referred S.S. to counseling through the Department. S.S. stated that she is receiving counseling through the HEART Group, a support group for battered women. Susana Thompson, an employee of the East Texas Crisis Center, stated that S.S. completed the HEART Group and was involved in peer counseling. She believed S.S. had made "a lot" of progress.

*The plans for the children by the parent*

S.S. admitted that if the children are returned to her, she does not want R.L.W. to have an influence on them, and that she would have to work on her own issues. Jones and Gatson stated that the Department's goal is unrelated adoption.

*The stability of the home*

The evidence shows that S.S. moved frequently, was unemployed, admitted using marijuana, and depended upon disability benefits, government housing, food stamps, and child support from K.S.'s father in order to provide for her children. She also admitted that R.L.W., a proven drug user, was still around her and the children, and that she had a three month old child with him. S.S. testified that R.L.W. abused her, although she stated that the children never witnessed the abuse.

*The acts or omissions of the parent that may indicate the existing parent-child relationship is not a proper one*

Kristina McGee stated that the children were removed from the home in July 2009 because of inconsistent stories about an injury to K.S.'s leg in addition to the possibility of drugs being used in the home. According to McGee, the injury appeared to be an adult handprint. McGee also testified that while at S.S.'s home investigating the K.S.'s injury, she smelled drugs, specifically crack cocaine. Further, she saw R.L.W. leave through the back door of the home. The first set of hair follicle drug test results revealed that R.L.W., S.S.1, and R.W., Jr. tested positive for cocaine.

Jones discovered R.L.W. in S.S.'s home in September and November 2009. She also stated that to her knowledge, R.L.W. came to see the children four or five times while they were in S.S.'s care during her first monitored return. Jones stated that the children's day care informed her in October 2010 that R.L.W. was dropping the children off at day care. Jones also had complaints about S.S. These complaints included a lack of supervision during one visit, S.S.'s electricity being cut off, S.S.'s frequent moves without informing the Department, and the Department's need to provide assistance to S.S. including day care, diapers, toilet paper, cleaning supplies, and gift cards for clothing.

S.S. was not honest regarding her relationship with R.L.W., contradicting her testimony that she had not seen him since October 2010 by admitting in July 2011 that she was

19

approximately five months pregnant with his child. Gatson stated that in July 2011, she received an allegation that R.L.W. was living in the home with S.S. and the children, that S.S. was pregnant, that S.S. and R.L.W. were smoking marijuana around the children, that R.L.W. was selling marijuana, and that R.L.W. beat S.S. and knocked out her teeth. At one point, Gatson took the children and S.S. home and recalled that upon entering the home, R.W., Jr. ran to the back of the house yelling, "Daddy." She also testified that the children told her that R.L.W. was in the house.

*Any excuse for the acts of omissions of the parent*

S.S. testified regarding K.S.'s injury. She stated that the night before, she heard K.S. crying and S.S.1 told her that he hit K.S. She stated that S.S.1 hit K.S. with a double hand clapper, which was a little smaller than her own hand. She denied that she or R.L.W. slapped K.S. or made the mark on K.S.'s leg. S.S. testified that when R.L.W.'s first set of drug test results were positive, she could not believe it. She explained that she has never used cocaine or allowed it around her children, and did not know how the children were exposed to drugs. However, she denied that her children were ever in danger while in her care.

S.S. stated that she has relocated to another city, is working with her caseworker at the crisis center, is attending church, and is trying to go back to the Andrews Center. She has completed the twelve steps of the HEART Group program, and noted that counseling through the HEART Group and the crisis center has helped. She stated at trial that she did not allow R.L.W. to live in her home, but admitted that he was still around and that she occasionally left her three month old child with him. Giles stated that she had a "seed of hope" that S.S. can make the changes needed in order for her children to be returned to her.

*Conclusion*

Viewing the evidence in the light most favorable to the finding, a reasonable fact finder could have concluded that two of S.S.'s children and R.L.W. tested positive for cocaine, that she and R.L.W. were admitted drug users, that R.L.W. abused her, that she was unable to stay away from R.L.W., a proven drug user, that she had another child with R.L.W., that she occasionally left her three month old child with R.L.W., that her home was unstable, that she lacked the resources to provide for her children, and that her parenting abilities and decisions were poor. Considering all the evidence in relation to the best interest factors in the light most favorable to

the court's finding, we conclude a reasonable trier of fact could have formed a firm belief or conviction that termination was in the best interest of the children.

There is disputed testimony about whether the children were abused by R.L.W. or witnessed his abuse of her. However, the jury reasonably could have found that S.S. failed to prevent two of her children from testing positive for drugs, failed to demonstrate that she could protect the children from drug abuse, failed to end her relationship with R.L.W., an admitted drug user, failed to prevent her children from living in a household with physical abuse, and failed to practice skills learned in parenting classes and counseling. The disputed evidence is not so significant that a reasonable trier of fact could not have reconciled this evidence in favor of its finding and formed a firm belief or conviction that terminating S.S.'s parental rights was in the best interest of the children.

We hold that the evidence is legally and factually sufficient to support the jury's finding that termination of S.S.'s parental rights is in the best interest of the children. Accordingly, the portion of S.S.'s first issue regarding the best interest of the children is overruled.

### PERMANENT MANAGING CONSERVATOR

In her second issue, S.S. argues that there is factually insufficient evidence that appointment of the Department as permanent managing conservator of the children was in their best interest. She contends that the evidence supports appointing her or, more specifically, her grandmother, C.S., as permanent managing conservator. A point in a motion for new trial is a prerequisite to a complaint of factual insufficiency of the evidence to support a jury finding. TEX. R. CIV. P. 324(b)(2). In her motion for new trial, S.S. did not complain that the evidence was factually insufficient to support the jury's finding that the Department should be named as managing conservator of the children. Consequently, she has not preserved this complaint for our review. *See Corrales v. Dep't of Family and Protective Svcs.*, 155 S.W.3d 478, 489 (Tex. App.—El Paso 2004, no pet.); *In re Marriage of Robinson*, 16 S.W.3d 451, 453 (Tex. App.—Waco 2000, no pet.). Accordingly, S.S.'s second issue is overruled.

### MOTION FOR NEW TRIAL

In her third issue, S.S. contends that her motion for new trial should have been granted. She argues that the combination of errors by the trial court constituted a violation of her right to

21

due process and amounted to such a denial of her rights as was reasonably calculated to cause, and probably did cause, rendition of an improper judgment.

## Standard of Review

We review the trial court's denial of a motion for new trial for an abuse of discretion. *See Strackbein v. Prewitt*, 671 S.W.2d 37, 38 (Tex. 1984); *Martinez v. Martinez*, 157 S.W.3d 467, 469 (Tex. App.—Houston [14th Dist.] 2004, no pet.). A trial court abuses its discretion when its decision is arbitrary, unreasonable, or without reference to any guiding rules or legal principles. *K-Mart Corp. v. Honeycutt*, 24 S.W.3d 357, 360 (Tex. 2000). The mere fact that a trial judge may decide a matter within his discretionary authority in a different manner than an appellate judge in a similar circumstance does not demonstrate that an abuse of discretion has occurred. *Downer*, 701 S.W.2d at 242.

## Analysis

In her brief, S.S. states that she is incorporating her motion for new trial, that the complaints in her motion previously argued in her brief will not be repeated, and that the brief contains a summary of the twelve complaints in her motion for new trial.

### Complaint Nos. 3, 4, 5, 6, 10, and 11

In complaints three, four, five, six, ten, and eleven, S.S. points out specific rulings by the trial court that she contends were erroneous. These complaints are set out below as they appear in S.S.'s brief:

(3)     Allowing expert testimony from witnesses not timely designated.

(4)     Allowing Kristina McGee to testify as an expert.

(5)     Allowing Angie Hope to testify as an expert.

(6)     Failing to grant a mistrial after the attorney for the State told the jury in opening that [S.S.] had been to TYC. This should be corrected. The information was not disclosed in opening, but through the Department's witness on direct. A Motion in Limine was granted as to [S.S.]'s juvenile record. The Department agreed (RR vol. 6, p. 57). However, the Department failed to instruct their witness not to mention it, and it was told to the jury. The judge denied the motion for mistrial. (RR vol. 8, p. 122-124).

(10)    Not allowing the CASA caseworker, Marita Giles, to give a formal recommendation to the jury, and instead allowing her supervisor Kim Johnson to give one. Kim Johnson, the CASA supervisor, wanted to give a formal recommendation for CASA. She did not agree with Marita Giles, the CASA caseworker. Giles said they tried to get her to see differently (RR vol. 10, p. 159-160). Johnson had no personal knowledge in this case (RR vol. 10, p. 118-119).Giles testified as the Ad Litem's witness. Johnson stood before the

22

jury and gave her testimony and recommendation. She was not subject to cross examination (RR vol. 10, p. 171).

(11) Allowing information concerning the criminal records of [C.S.]'s adult children. Testimony was allowed concerning the criminal history of [C.S.]'s adult children. Kiffany Gatson was then allowed to testify that [C.S.]'s children have been in and out of jail and that her grandchildren have followed that same bad lifestyle (RR. vol. 10, p. 17), thus holding [C.S.] responsible for her children's criminal history (RR vol. 10, p. 19-20).

Rule 38.1 of the Texas Rules of Appellate Procedure sets forth what must be included in an appellant's brief. *See* TEX. R. APP. P. 38.1. Rule 38.1(i) requires that an appellant's brief "contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record." TEX. R. APP. P. 38.1(i). The appellate court has no duty to brief issues for an appellant. *Huey v. Huey*, 200 S.W.3d 851, 854 (Tex. App.—Dallas 2006, no pet.). The failure to provide appropriate record citations or a substantive analysis waives an appellate issue. *WorldPeace v. Comm'n for Lawyer Discipline*, 183 S.W.3d 451, 460 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (holding that failure to offer argument, citations to record, or citations to authority waives issue on appeal); *Med. Specialist Group, P.A. v. Radiology Assocs ., L.L.P.*, 171 S.W.3d 727, 732 (Tex. App.—Corpus Christi 2005, pet. denied) (same); *see also* *Fredonia State Bank v. Gen. Am. Life Ins. Co.*, 881 S.W.2d 279, 284–85 (Tex. 1994) (holding appellate court has discretion to deem points of error waived due to inadequate briefing). Appellate courts must construe briefing requirements reasonably and liberally, but a party asserting error on appeal still must put forth some specific argument and analysis showing that the record and the law support her contention. *San Saba Energy, L.P. v. Crawford*, 171 S.W.3d 323, 338 (Tex. App.—Houston [14th Dist.] 2005, no pet.).

Although S.S. includes some citations to the record, she does not provide any argument or cite any authority in support of these complaints. Further, in complaints three, four, and five, she does not provide any citations to the record. In the absence of any legal analysis or citation to appropriate authorities, S.S. presents nothing for our review regarding complaints three, four, five, six, ten, and eleven. *See WorldPeace*, 183 S.W.3d at 460; *Med. Specialist Group*, 171 S.W.3d at 732. Accordingly, we overrule these complaints.

*Complaint No. 1*

In her first complaint, S.S. argues that "[n]ewly discovered evidence [showed] that the Henderson County District Attorney's office had a conflict of interest based on prior representation" of her. She complains that the district attorney should have been "disqualified"

because he represented her on a misdemeanor assault in September 2007. In her motion for new trial, she stated that she believed information from the former representation affected the actions of the Department's attorney, who worked for the district attorney.

We first note that a party seeking a new trial on grounds of newly discovered evidence must demonstrate to the trial court that (1) the evidence has come to its knowledge since the trial, (2) its failure to discover the evidence sooner was not due to lack of diligence, (3) the evidence is not cumulative, and (4) the evidence is so material it would probably produce a different result if a new trial were granted. *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 813 (Tex. 2010). Further, admissible evidence must be introduced at a hearing on the motion for new trial establishing such essential facts as no prior knowledge on the part of the movant, and the nature of the newly discovered evidence. *Strong v. Strong*, 350 S.W.3d 759, 772 (Tex. App.—Dallas 2011, pet. denied).

In S.S.'s affidavit, which was attached to the motion for new trial, she states that she did not know the Department's attorney worked for the district attorney until the last day of trial. At that point, she states, she informed her attorney that the district attorney had previously represented her, and that she did not "like that he was on [the Department's] side." These statements establish that S.S. acquired knowledge of the evidence during trial, and not afterward, as required for obtaining a trial based on newly discovered evidence. *See Waffle House, Inc.*, 313 S.W.3d at 813. Further, S.S. did not present any evidence to show that her failure to discover the evidence sooner was not due to a lack of diligence. *See id.*; *Strong*, 350 S.W.3d at 772. Also, satisfaction of the fourth requirement requires a showing that the evidence would probably produce a different result if a new trial were granted. S.S. did not make such a showing.

When an alleged conflict of interest is at issue, a district attorney or his staff may not be disqualified unless an actual conflict of interest exists and that conflict rises to the level of a due process violation. *See Landers v. State*, 256 S.W.3d 295, 304 (Tex. Crim. App. 2008). If a prosecuting attorney has formerly represented the defendant in the "same" criminal matter as that currently being prosecuted, he is statutorily disqualified. TEX. CODE CRIM. PROC. ANN. art. 2.01 (West 2005); *Landers*, 256 S.W.3d at 304. But in the context of a conflict of interest claim that does not involve prior representation in the same criminal matter, the rule is somewhat different. *Landers*, 256 S.W.3d at 304. A district attorney is not automatically disqualified from prosecuting a person whom he had previously represented, even when it is for the same type of

24

offense. *Id.* In that context, a due process violation occurs only when the defendant can establish "actual prejudice," not just the threat of possible prejudice to her rights by virtue of the district attorney's prior representation. *Id.* at 304-05. Actual prejudice would occur, for example, if

1. The prosecuting attorney has previously personally represented the defendant in "a substantially related matter;" and

2. The prosecuting attorney obtained "confidential" information by virtue of that prior representation which was used to the defendant's disadvantage.

*Id.* at 305 (quoting TEX. DISCIPLINARY R. PROF'L CONDUCT 1.05, 1.09(a)(3), *reprinted* in TEX. GOV'T CODE, tit. 2, subtitle G app. A (West 2005 & Supp. 2012)). A prosecutor cannot be disqualified from prosecuting a former client if the criminal trials are not closely or substantially related. *Id.* at 306-07. In determining whether matters are substantially related, the question is whether the same or inextricably related facts, circumstances, or legal questions are at issue in both proceedings, not whether both charges are for the same criminal offense, or both offenses involve guns, drugs, or other specific facts. *Id.* at 307. "Confidential communications" include both privileged and unprivileged client information that the prosecutor learned by virtue of the former attorney-client relationship, but it excludes information that is generally known. *Id.* at 307-08.

Regarding the first prong, S.S. stated in her affidavit that the district attorney represented her in a misdemeanor case in 2007. This was two years before the Department's petition was filed in this case. S.S. did not show that the 2007 misdemeanor case and the instant termination case were "substantially related," or that the same or inextricably related facts, circumstances, or legal questions were at issue in both proceedings. *Id.* at 306-07. Regarding the second prong, S.S. did not point to any information that the district attorney learned or might have learned during his 2007 representation that was not already in the public domain and testified to at trial. *Id.* at 310. Consequently, S.S. failed to show that actual prejudice resulted from the district attorney's prior representation of her. Therefore, she did not satisfy the fourth requirement for obtaining a new trial based on newly discovered evidence.

Because S.S. failed to satisfy the first, second, and fourth requirements for obtaining a new trial based on newly discovered evidence, we overrule S.S.'s first complaint.

*Complaint No. 2*

In her second complaint, S.S. argues that there is "[n]o evidence or legally and factually insufficient evidence to support the verdict." In her motion for new trial, she complained that there was no evidence or insufficient evidence to support the jury's finding, or the trial court's judgment, that S.S. had engaged in one or more of the acts or omissions necessary to support termination of her parental rights, and that termination of the parent-child relationship between S.S. and the children was in the children's best interest. We have already determined that the evidence is legally and factually sufficient to support termination of S.S.'s parental rights under subsection 161.001(1)(O), and that termination of S.S.'s parental rights is in the best interest of the children. Therefore, we overrule S.S.'s second complaint.

*Complaint No. 7*

In her seventh complaint, S.S. contends that the trial court erred by "failing to grant Movant's request for mistrial based on Brandi Harris['s] telling the jury she had just received information that one of the foster parents now wanted to adopt the children." After Harris testified at trial, the trial court granted the children's attorney's request to make an offer of proof by allowing Marita Giles to testify outside the presence of the jury. Giles, a court appointed special advocate volunteer, stated that she contacted R.W., Jr.'s foster mother who indicated that she was interested in adopting R.W., Jr. only, and not all three children. S.S. admitted that after Giles's testimony, and with the agreement of the children's attorney and the Department, the trial court instructed the jury to disregard Harris's testimony concerning prospective adoption by one of the children's current foster parents, and not to consider it for any purpose. Here, even though S.S. includes some citations to the record, she does not provide any argument or cite any authority in support of the reasons why the trial court's instruction to the jury was not sufficient to cure any error. *See* TEX. R. APP. P. 38.1(i). In the absence of any legal analysis or citation to appropriate authorities, S.S. presents nothing for our review regarding her seventh complaint. *See **WorldPeace***, 183 S.W.3d at 460; ***Med. Specialist Group***, 171 S.W.3d at 732.

Moreover, as a predicate to presenting a complaint on appeal that evidence was admitted in error, the complaining party must have preserved the error at trial by a proper request, objection, or motion stating the grounds for the ruling that the party sought from the trial court with sufficient specificity to make the trial court aware of the complaint, and securing a ruling on the request, objection, or motion. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2); ***Ethington v. State***, 819

S.W.2d 854, 858 (Tex. Crim. App. 1991). S.S. did not complain to the trial court about Harris's testimony regarding adoption or request a mistrial. Therefore, she has waived this issue on that basis as well. *See* TEX. R. APP. P. 33.1(a)(1)(A), (2). We overrule S.S.'s seventh complaint.

*Complaint No. 8*

In her eighth complaint, S.S. states that the Department made "an improper and prejudicial jury argument not capable of being corrected by instruction." She contends that the Department's attorney pointed to a picture of K.S. and asked "[i]s she going to be the next [S.S.], like she was the . . . [S.S.] was the next [S.S.2]."[7] Then, according to S.S., the attorney asked if the boys were going to be like their uncle, their fathers, or K.S.'s father. S.S. also complains that the Department's attorney argued that "I imagine R.L.W. lived in that house." However, S.S. did not include a citation to the record for this statement, and we were unable to locate it in the Department's jury argument.

During the Department's jury argument, S.S. did not object or request a limiting instruction pertaining to the first two statements. Generally, an objection must be made immediately after the contested statement, or the error is waived. *Miller v. Bock Laundry Mach. Co.*, 568 S.W.2d 648, 653 (Tex. 1977). However, a complaint of incurable jury argument may be asserted and preserved in a motion for new trial, even without a complaint and ruling during the trial. *See* TEX. R. CIV. P. 324(b)(5); *Phillips v. Bramlett*, 288 S.W.3d 876, 883 (Tex. 2009). The test for improper jury argument is whether, based on the record as a whole, the offensive argument was so extreme that a juror of ordinary intelligence could have been persuaded by that argument to agree to a verdict contrary to that to which he would have agreed but for such argument. *See Phillips*, 288 S.W.3d at 883. Reversal is required only when the entire record shows that the argument was improper, uninvited and unprovoked, preserved, and incurable by instruction, withdrawal, or trial court reprimand. *See Standard Fire Ins. Co. v. Reese*, 584 S.W.2d 835, 839 (Tex. 1979). The complaining party on appeal must explain why opposing counsel's argument was incurable based on an evaluation of the entire case, from voir dire to closing argument. *Arthur J. Gallagher & Co. v. Dieterich*, 270 S.W.3d 695, 708 (Tex. App.—Dallas 2008, no pet.) (op. on reh'g).

In this case, S.S. failed to object to the complained of argument or request a limiting instruction, but complained in her motion for new trial that these two statements were incurable.

---

[7] The initials of S.S. and her mother are the same. Therefore, this reference is to S.S.'s mother, S.S.2.

Thus, she was required to explain why the Department's argument was incurable based on an evaluation of the entire case. *See Dieterich*, 270 S.W.3d at 708. However, S.S. failed to do so, providing no argument in support of her contention. *See* TEX. R. APP. P. 38.1(i). In the absence of any legal analysis, S.S. presents nothing for our review. Therefore, S.S.'s eighth complaint is overruled.

*Complaint No. 9*

In her ninth complaint, S.S. contends that the trial court erred by denying "Movant's objection to the charge that instructed the jury to find all grounds and terminate [R.L.W.]'s rights." At trial, the children's attorney requested a directed verdict against R.L.W. as to each ground set forth by the Department. The Department concurred, and S.S. joined in the motion. In the jury charge, the trial court instructed the jury to answer "yes" to all the questions in the charge supporting termination of R.L.W's parental rights to R.W., Jr. Following its instructions, the jury answered "yes" to the questions in the charge relating to termination of R.L.W.'s parental right.

A litigant is precluded from requesting a ruling from a court and then complaining that the court committed error in giving it to her. *Tittizer v. Union Gas Corp.*, 171 S.W.3d 857, 861 (Tex. 2005); *Neasbitt v. Warren*, 22 S.W.3d 107,112 (Tex. App.—Fort Worth 2000, no pet.). This doctrine is commonly referred to as the "invited error" doctrine. *See Tittizer*, 171 S.W.3d at 862. Because S.S. joined in the motion requesting a directed verdict against R.L.W., she cannot now successfully challenge the trial court's ruling on this basis. Consequently, she is estopped from complaining that the trial court "instructed the jury to find all grounds and terminate [R.L.W.]'s rights." Therefore, S.S.'s ninth complaint is overruled.

*Complaint No. 12*

In her twelfth complaint, S.S. argues that the trial court erred by not "requiring the Department to provide information and pictures of the multiple injuries to the children while in foster care." S.S. refers us to *Thomas v. State*, 841 S.W.2d 399 (Tex. Crim. App. 1992) for the proposition that due process is violated when a prosecutor fails to disclose evidence that is favorable to the accused and creates a probability sufficient to undermine the confidence in the outcome of the proceeding. *Id.* at 404. "Evidence withheld by a prosecutor is 'material' if there is 'a reasonable probability that, had the evidence been disclosed to the defense, the outcome of the proceeding would have been different.'" *Wyatt v. State*, 23 S.W.3d 18, 27 (Tex. Crim. App.

2000) (quoting ***United States v. Bagley***, 473 U.S. 667, 682, 105 S. Ct. 3375, 3383, 87 L. Ed. 2d 481 (1985)).

S.S. does not provide any authority that this rule relates to civil termination cases. She cites ***M.L.B. v. S.L.J.***, 519 U.S. 102, 124, 117 S. Ct. 555, 568, 136 L. Ed. 2d 473 (1996) for the proposition that termination cases are "quasi-criminal" cases in which the state may not "bolt the door to equal justice." *See **id**.* This case, however, does not relate to S.S.'s complaint. Instead, ***M.L.B.*** involves access to the judicial process in quasi-criminal cases, i.e., parental rights cases, turning on the ability to pay for a record. *See **id**.* Even if the rule stated in ***Thomas*** and ***Wyatt*** related to termination cases, S.S. does not show that the information or pictures of the children's injuries exist or that the Department was required to turn over this evidence. *See **Wyatt***, 23 S.W.3d at 27. Nor does her brief contain any argument or analysis showing that the outcome of the proceedings would have been different if the information or pictures had been provided to her. *See **id**.* In the absence of any legal analysis or authority relating to the complaint she asserts, S.S. presents nothing for our review regarding her twelfth complaint. *See* Tex. R. App. P. 38.1(i); ***WorldPeace***, 183 S.W.3d at 460; ***Med. Specialist Group***, 171 S.W.3d at 732. Therefore, S.S.'s twelfth complaint is overruled.

*Conclusion*

We have held that S.S. waived her third, fourth, fifth, sixth, seventh, eighth, tenth, eleventh, and twelfth complaints, and have overruled her first, second, and ninth complaints. Therefore, we also hold that the trial court did not err in denying S.S.'s motion for new trial. Consequently, we disagree with S.S.'s conclusion that the trial court committed errors amounting to such a denial of her rights "as was reasonably calculated to cause and probably did cause rendition of an improper judgment." S.S.'s third issue is overruled.

## DISPOSITION

The judgment of the trial court is ***affirmed***.

**JAMES T. WORTHEN**
Justice

Opinion delivered November 30, 2012.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*

(PUBLISH)

29



# COURT OF APPEALS
# TWELFTH COURT OF APPEALS DISTRICT OF TEXAS
# JUDGMENT

**NOVEMBER 30, 2012**

**NO. 12-12-00119-CV**

**IN THE MATTER OF S.S., K.S., AND R.W., JR., CHILDREN**

---

Appeal from the 173rd Judicial District Court

of Henderson County, Texas. (Tr.Ct.No. 2009-A-635)

---

THIS CAUSE came to be heard on the appellate record and briefs filed herein, and the same being considered, it is the opinion of this court that there was no error in the judgment.

It is therefore ORDERED, ADJUDGED and DECREED that the judgment of the court below **be in all things affirmed**, for which execution may issue, and that this decision be certified to the court below for observance.

James T. Worthen, Chief Justice.
*Panel consisted of Worthen, C.J., Griffith, J., and Hoyle, J.*